UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11573-RWZ

| | |
|---|---|
| ANTHONY P. SCAPICCHIO, M.D.,<br>Plaintiff, | )<br>)<br>) |
| v. | )<br>) |
| MOUNT AUBURN PROFESSIONAL<br>SERVICES, a Massachusetts non-<br>profit corporation, MOUNT AUBURN<br>HOSPITAL, a hospital incorporated<br>in Massachusetts, for itself and as<br>administrator of the Mount Auburn<br>Hospital RetirementPlus 403(b)<br>Plan, and THOMAS FABIANO,<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## NOTICE OF PLAINTIFF ANTHONY P. SCAPICCHIO, M.D., THAT HE INTENDS TO PROCEED WITH THIS LITIGATION

Now comes the Plaintiff, Anthony P. Scapicchio, M.D., and, in accordance with this Honorable Court's November 15, 2004 Scheduling Order, hereby provides notice to the Court and the Defendants that he intends to proceed with this litigation. The information set forth below is intended solely to summarize the factual support for Dr. Scapicchio's decision to continue with this litigation, and it is not intended to limit either the nature and scope of Dr. Scapicchio's claims against the Defendants or the damages that are recoverable by Dr. Scapicchio.

### FACTUAL SUMMARY

Dr. Scapicchio became the chief of emergency services for Defendant Mount Auburn Hospital ("MAH") in 1974, became chief of ambulatory services for MAH in 1976, was promoted to chairman of the department of emergency medicine in 1987, and

became chairman emeritus, department of emergency medicine, in 1989. Dr. Scapicchio's professional responsibilities at MAH, as medical director for the administrative department of ambulatory care services, included all phases of operation including design, planning, staffing, and clinical and fiscal integrity. See Complaint, ¶8; see, also, Dr. Scapicchio's Curriculum Vitae, a copy of which is attached hereto as Exhibit A. Dr. Scapicchio became disabled in 1995 and, upon the recommendation of MAH employees, he applied for long term disability insurance benefits pursuant to a long-term disability plan that MAH began to offer in 1994 as part of MAH's RetirementPlus 403(b) Plan Account ("the Plan"), and these benefits were granted to him in 1995. See Complaint, ¶¶10 and 14. As is indisputably established by the August 21, 1995 correspondence attached hereto as Exhibit B, Dr. Scapicchio's annual compensation from MAH at the time he went on disability was $161,232.72. Under the terms of the Plan, MAH employees with Dr. Scapicchio's length of service as of 1995 generally were entitled to an employer contribution from MAH in the amount of eight percent (8%) of his annual compensation to their retirement accounts, with the limitation that "the maximum compensation taken into account under this [P]lan during any year is limited to $150,000, as adjusted annually by the Secretary of the Treasury to reflect increases in the cost-of-living." See RetirementPlus Plan, attached hereto as Exhibit C, at Article II, ¶2.3.

Dr. Scapicchio remained on long-term disability under the Plan until December 2002, when he reached the retirement age of 65 years. Dr. Scapicchio had been personally involved in the development of the Plan in his capacity as head of emergency services at MAH, and he played a leading role in developing the Plan so that MAH could recruit highly qualified physicians. The intent of the Plan developers was to ensure a

2

fully funded retirement plan. See Complaint, ¶11. Nevertheless, and as set forth in the Complaint, the Defendants wrongfully failed and/or refused to satisfy their collective obligation to fund Dr. Scapicchio's retirement account with employer contributions from MAH during the term of his disability, and this wrongful conduct forms the basis for Dr. Scapicchio's various claims and causes of action.

## CALCULATION OF POTENTIAL DAMAGES

Dr. Scapicchio's accountant, Dan Clasby of Beverly, Massachusetts, has performed a calculation of losses suffered by Dr. Scapicchio as a result of the Defendants' wrongful conduct, and this calculation is attached hereto as Exhibit D. Mr. Clasby's attached calculation reflects the annual adjustment to maximum employer contributions, as set by the Secretary of the Treasury, between 1995 and 2002, and assumes that Dr. Scapicchio's annual compensation, if he had not taken long-term disability benefits in 1995, would have continued to exceed the maximum annual employer contribution limit. This assumption is sound, especially in light of the facts that Dr. Scapicchio's annual compensation in 1995 was $161,232.72 and the maximum employer contribution limit remained $160,000 through 1999. See Exhibit B.

Mr. Clasby's attached calculation also notes the voluntary employee retirement contributions that Dr. Scapicchio forewent by taking disability benefits in 1995. These contributions are properly included within Dr. Scapicchio's scope of damages because, without limitation, Dr. Scapicchio maintains that – given the nature of his disability - he would not have applied for disability benefits in 1995 if MAH's employees had told him that, upon acceptance of disability benefits, his retirement benefits would be discontinued.

3

Mr. Clasby's attached calculation reflects that the total amount of retirement funds lost to Dr. Scapicchio as of 2002, when he reached 65 years of age, is $238,706.37. Mr. Clasby's calculation then projects an annual return of 3.5% on this amount through 2007, which is the year when Dr. Scapicchio will reach 70.5 years of age and, therefore, would have been able to begin drawing these lost retirement funds without penalty. Based upon Mr. Clasby's conservative projected annual return of 3.5%, the total sum of retirement funds lost to Dr. Scapicchio is $283,508.28. Dr. Scapicchio maintains that the 3.5% annual return projected by Mr. Clasby is too conservative in light of the manner in which Dr. Scapicchio's portfolio is managed. Moreover, Dr. Scapicchio also notes that, since retirement funds under the terms of the Plan are tax-deferred until age 70.5 years, any assessment of damages must compensate Dr. Scapicchio for the tax liability he may immediately incur as a result of receiving damages directly from the Defendants at this time. Finally, the attached calculation of damages does not reflect any fees, costs, or other damages to which Dr. Scapicchio claims he is entitled as a result of the claims and causes of action set forth in the Complaint. Nevertheless, Dr. Scapicchio respectfully contends that Mr. Clasby's attached calculation, which sets the minimum amount of

4

damages at $283,508.28, provides sufficient rationale for Dr. Scapicchio's decision to

proceed with this litigation.

Respectfully submitted,
**ANTHONY P. SCAPICCHIO, M.D.**
By his attorney,

/s/

_____
John S. Day (BBO #639249)
167 Washington Street
Norwell, MA 02061
781-878-6541 (telephone)
781-846-0780 (facsimile)
jday@attorneyday.com (electronic mail)

Date:   December 17, 2004

**CERTIFICATE OF SERVICE**

I, John S. Day, hereby certify that on the 17th day of December, 2004, I caused a copy of the foregoing to be served, by electronic filing, upon Philip M. Cronin, Peabody & Arnold, 30 Rowes Wharf, 6th Floor, Boston, Massachusetts 02110.

/s/

_____
John S. Day

5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11573-RWZ

| | |
|---|---|
| ANTHONY P. SCAPICCHIO, M.D.,<br>Plaintiff, | )<br>)<br>) |
| v. | )<br>) |
| MOUNT AUBURN PROFESSIONAL<br>SERVICES, a Massachusetts non-<br>profit corporation, MOUNT AUBURN<br>HOSPITAL, a hospital incorporated<br>in Massachusetts, for itself and as<br>administrator of the Mount Auburn<br>Hospital RetirementPlus 403(b)<br>Plan, and THOMAS FABIANO,<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## NOTICE OF PLAINTIFF ANTHONY P. SCAPICCHIO, M.D., THAT HE INTENDS TO PROCEED WITH THIS LITIGATION

### EXHIBIT A

Curriculum Vitae of Anthony P. Scapicchio, M.D.

## CURRICULUM VITAE

Name:                  Anthony Pasquale Scapicchio, M.D.

Address:               240 Nahant Road, Nahant, Massachusetts  01908

Home Telephone:        (617) 581-1310

Office Address:        Department of Emergency Medicine, Mount Auburn Hospital,
                       330 Mount Auburn Street, Cambridge, Massachusetts  02238

Office Telephone:      (617) 492-3500, (617) 499-5025

Date of Birth:         December 18, 1937

Place of Birth:        Everett, Massachusetts


Education:

   1959 B.S.           Biology, Boston College, Chestnut Hill, Massachusetts
   1963 M.D.           New Jersey College of Medicine and Dentistry


Postdoctoral Training:

   Internship and Residencies:

   1963-1964           Surgical Intern, Harvard Surgical Unit, Boston City Hospital,
                       Boston, Massachusetts
   1964-1965           Junior Assistant Surgical Resident, Boston City Hospital, Harvard
                       Surgical Unit, Boston, Massachusetts
   1965-1966           Senior Assistant Surgical Resident, Boston City Hospital, Harvard
                       Surgical Unit, Boston, Massachusetts
   1967-1968           Resident in Surgery, Harvard Surgical Unit, Boston City Hospital,
                       Boston, Massachusetts
   1968-1969           Chief Resident in Surgery, Harvard Surgical Unit, Boston City
                       Hospital, Boston, Massachusetts

- 2 -

Research:

| | |
|---|---|
| 1966-1967 | Clinical and Research Fellow in Surgery, Harvard Medical School, Massachusetts General Hospital, Boston, Massachusetts |

Military Service:

| | |
|---|---|
| 1969-1971 | United States Army, Martin Army Hospital, Fort Benning, Georgia, Republic of Vietnam<br>United States Army Hospital, Fort Devens, Massachusetts |

Licensure, Certifications, and Societies:

| | |
|---|---|
| 1964 | Diplomate, National Board of Medical Examiners |
| 1971 | Massachusetts License |
| 1971 | Office of Emergency Medical Services, Chairman, Area 25, Emergency Medical Services Committee |
| 1971 | American College of Emergency Physicians |
| 1972 | Diplomate, American Board of General Surgery |
| 1/27/89 | Advanced Cardiac Life Support by American Heart Association |
| 2/23/89 | Advanced Trauma Life Support by Committee on Trauma American College of Surgeons |
| 1990 | Diplomate, American Board of Emergency Medicine |
| 1991 | Fellow, American College of Emergency Physicians |

Hospital Appointments:

| | |
|---|---|
| 1971-1974 | Staff Surgeon, Cambridge Hospital, Emergency Room, Cambridge, Massachusetts |
| 1971-1974 | Staff, Emergency Room, Brockton Hospital, Brockton, Massachusetts |
| 1974-1976 | Chief of Emergency Services, Mount Auburn Hospital, Cambridge, Massachusetts |
| 1976-1987 | Chief of Ambulatory Services, Mount Auburn Hospital, Cambridge, Massachusetts |
| 1987-1989 | Chairman, Department of Emergency Medicine, Mount Auburn Hospital, Cambridge, Massachusetts |
| 1989- | Chairman Emeritus, Department of Emergency Medicine, Mount Auburn Hospital, Cambridge, Massachusetts |

- 3 -

Medical School Appointments:

| | |
|---|---|
| 1971-1972 | Clinical Assistant in Surgery, Harvard Medical School, Boston, Massachusetts |
| 1972- | Clinical Instructor in Surgery, Harvard Medical School, Boston, Massachusetts |

Hospital Committee Assignments:

Chairman, Ambulatory Care Committee
Chairman, Emergency Services Committee
Medical Staff Executive Committee
Credentials Committee
By Laws Committee
President, Medical Staff 1988
Quality Assurance Committee

Publications:

1.  Scapicchio, A.P., Constable, J.D., Opitz, B. Comparative effects of silver nitrate and sulfamylon acetate in epidermal regeneration: plastic and reconstructive surgery. Vol. 41, No. 4, 1968; pp. 319-322.

2.  Cohen, E.L., Scapicchio, A.P. The E.D. in the eyes of the law. Emergency Medicine. Vol. 14, No. 12, 1982; pp. 186-199.

3.  Cohen, E.L., Healy, J.M., Scapicchio, A.P. Medicolegal consideration of Emergency Medical Care. Emergency Medicine. Max, H.L., Ed. John Wiley and Sons, 1984; pp. 883-893.

ANTHONY P. SCAPICCHIO, M.D.

*B.*

- EXPERIENCE:

- ADMINISTRATIVE-
- Medical Director for the Administrative Department of
  Ambulatory Care Services.

- Ambulatory Care Services include Emergency, Walk-In,
  Primary Care, Sub-Specialty, Sub-Specialty-followup,
  Orthopedic-Cast, Day Surgery and Multi-test Units.

- The position includes responsibility for all phases of
  operation including design, planning, staffing, clinical
  and fiscal integrity.

- The position reports directly to the Chief Excutive Officer
  of the hospital through his assistant in charge of clinical
  services.

ADMINISTRATIVE-CLINICAL

- Developed the Department of Ambulatory Care Services into an independent Administrative Department.

- Developed each of the units within the Department of Ambulatory Care Services into an indepedent unit with its permanent full-time staff and separate cost center.

- Developed the role and job descriptions for the following full-time positions.

    a) Chief of Ambulatory Services to be on a par with other clinical chiefs.
    b) Administrative Director of Ambulatory Care Services to be on a par with other administrative department heads.
    c) Clinical Director of Ambulatory Care Nursing to be on a par with other nursing clinical directors but accountable directly to the Chief of Ambulatory Services. Ambulatory Care Nursing is an independent nursing unit with a liaison relationship to Hospital Nursing.
    d) Chief of Emergency Services
    e) Medical Director of Primary Care Services
    f) Emergency Unit Staff Physicians
    g) Primary Care Unit Staff Physicians
    h) Head Nurse and Assistant Head Nurse for all Ambulatory Care Units
    i) Chief Technicians for Orthopedic and Multi-test Units
    j) Clerical Supervisor for Ambulatory Care Services
    k) Permanent Part-time Sub-Specialists
    l) Nurse Practitioner in Ambulatory Care.

- Transformed the Emergency Unit with its traditional rotating attending staff and patient volume of 23000 visits per year to a prototype for the community teaching hospital with regards to staffing. The Emergency Unit now sees 35000 patients per year - admits 4500 patients per year and is staffed by a full-time Chief of Emergency Services and 5 full-time staff physicians - all career oriented in Emergency Medicine, and 6 house officers.

- Transformed the traditional OPD with its voluntary attending staff and patient volume of 4000 visits per year to a prototype for the community teaching hospital with regards to format. The OPD now consists of Primary Care, Walk-In, Sub-Specialty and Sub-Specialty follow-up Units sees 25000 patients per year and is staffed by full-time physicians of appropriate training skills and house officers.

- Initiated an Ambulatory Surgery Unit which is now handling almost 2000 cases per year.

- Upgraded the Orthopedic-Cast Unit by writing new job descriptions for its full-time technicians - now seeing close to 4000 cases per year.

- Supervise a Multi-test Unit for the performance of routine admission and other diagnostic tests by Multi-disciplinary technicians - now handling about 140 patients per day.

TEACHING

- teaching of 2nd, 3rd, or 4th year students
- teaching of house staff on rotation to Ambulatory Care Units
- teaching of house staff on wards
- teaching house staff Basic and Advanced Cardiac Life Support
- teaching attending staff Basic Life Support
- medical director and lecturer in hospital sponsored Emergency Medical Technician Course
- preparation of proposal for Emergency Medicine Residency Program for Mount Auburn Hospital

EMERGENCY MEDICAL SERVICES

- chair person of Area 25 EMS committee
- promote area wide disaster planning and disaster drills
- submitted proposal for designation as associate hospital in Region IV
- supporting concept of Regional Trauma Centers
- promoting the development of Emergency Medicine through The American College of Emergency Physicians

RESEARCH AND GRANTS

- oversee all grant applications from Ambulatory Services
- overseeing current grants to:
  - a) Emergency Unit- Multi hospital study of chest pain in the Emergency Unit
  - b) Primary Care Unit - ambulatory chronic care

QUALITY ASSURANCE

- supervise on going audits of all phases of Ambulatory Care
- monitoring of all full-time ambulatory care physicians in maintaining continuing medical education activities
- writing of policies and procedures - relating to Ambulatory Care

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11573-RWZ

ANTHONY P. SCAPICCHIO, M.D.,  )
     Plaintiff,  )
          )
          )
v.  )
          )
MOUNT AUBURN PROFESSIONAL  )
SERVICES, a Massachusetts non-  )
profit corporation, MOUNT AUBURN  )
HOSPITAL, a hospital incorporated  )
in Massachusetts, for itself and as  )
administrator of the Mount Auburn  )
Hospital RetirementPlus 403(b)  )
Plan, and THOMAS FABIANO,  )
     Defendants.  )
          )

## NOTICE OF PLAINTIFF ANTHONY P. SCAPICCHIO, M.D., THAT HE INTENDS TO PROCEED WITH THIS LITIGATION

### EXHIBIT B

August 21, 1995 Correspondence regarding Dr. Scapicchio's
Annual Compensation from Mount Auburn Hospital



60-63

Liberty Life Assurance Company
of Boston

100 Main Street
Dover, New Hampshire 03820
Telephone: (603) 749-2600

August 21, 1995

Anthony Scapicchio
240 Nahant Rd.
Nahant, MA  01908

RE:   **LONG TERM DISABILITY**
      **Claim No. X5143N003**

Dear Dr. Scapicchio,

This letter is in regards to your claim for Long Term Disability.  It is to serve as a correction to your July 10, 1995 benefit approval letter.

It has been brought to our attention that the original gross monthly income of $12,401.00 was incorrect.  We have made an adjustment and are now paying you a 70% monthly benefit based on a gross monthly income of $13,436.06.  Making your gross monthly benefit $9,404.54.  We have issued you $723.84 in your August check to compensate for this mistake on your July check.

Should you have any questions regarding this correspondence, please feel free to contact me.

Sincerely,

Tiffany Curtis
LTD Analyst
1-800-451-7065  Ext. 34934

TC/as

*8/25/95 due 723.84 for may/June.*
*to send 1423.⁺ ī Sep check o*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11573-RWZ

| | |
|---|---|
| ANTHONY P. SCAPICCHIO, M.D., | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| MOUNT AUBURN PROFESSIONAL | ) |
| SERVICES, a Massachusetts non- | ) |
| profit corporation, MOUNT AUBURN | ) |
| HOSPITAL, a hospital incorporated | ) |
| in Massachusetts, for itself and as | ) |
| administrator of the Mount Auburn | ) |
| Hospital RetirementPlus 403(b) | ) |
| Plan, and THOMAS FABIANO, | ) |
| Defendants. | ) |
| | ) |

### NOTICE OF PLAINTIFF ANTHONY P. SCAPICCHIO, M.D., THAT HE INTENDS TO PROCEED WITH THIS LITIGATION

EXHIBIT C

RetirementPlus Plan, as amended and restated effective January 1, 1995

# RETIREMENTPLUS

A Retirement Plan for Employees
of Mount Auburn Hospital

As amended and restated effective January 1, 1995

# ARTICLE I

## INTRODUCTION

1.1 <u>Establishment of Plan</u>. This is the plan document for RetirementPLUS (the "plan") which is a retirement savings plan established by Mount Auburn Hospital for the benefit of its employees and the employees of Mount Auburn Foundation, Inc. and Mount Auburn Professional Services, Inc. (together, the "hospital"). The plan was established January 1, 1990 and has been amended from time to time as set forth on Schedule A.

1.2 <u>Description of Plan</u>. The plan is a tax deferred annuity plan and is intended to meet the requirements of Section 403(b) of the Internal Revenue Code of 1986 (the "Code"). It is a type of defined contribution, individual account plan. The plan is also intended to meet the applicable provisions of the Employee Retirement Income Security Act of 1974 ("ERISA").

1.3 <u>Plan Contributions</u>. The plan provides for contributions by the hospital and voluntary contributions by participants. In general, hospital contributions are made for employees (others than students) who are regularly scheduled to work at least 20 hours per week, have reached age 21 and have worked at the hospital for at least two years. The amount of the contribution is a percentage of pay based on your years of employment with the hospital. Voluntary contributions may be made by any employee. Any voluntary contributions will be tax deferred for federal income tax purposes and will increase your retirement savings.

1.4 <u>Plan Benefits</u>. The hospital's contributions and any of your voluntary contributions to the plan are invested in a group annuity contract issued by an approved insurance company or in mutual funds issued by an approved investment company, as directed by you. When you leave employment with the hospital and upon certain other specified events, you will be entitled to receive benefit payments from your accounts.

1.5 <u>Vesting</u>. Your accounts under the plan are fully vested and non-forfeitable at all times.

# ARTICLE II

## HOSPITAL CONTRIBUTIONS

2.1 <u>Eligibility</u>. In order to receive hospital contributions, you must be an eligible employee and satisfy an age and service requirement. All employees who are regularly scheduled to work at least 20 hours per week are eligible, except for persons whose employment is incidental to an educational program at the hospital (such as interns, residents, fellows and radiology students). You may begin participation in the plan once you have reached age 21 and have a total of two years of employment as an eligible employee, whether or not consecutive. To the extent provided in Schedule B, employment with a predecessor employer will be treated as employment with the hospital. See Section 8.2 for a special participation rule for employees who have service with the hospital as an ineligible employee and later become eligible.

2.2 <u>Enrollment</u>. In order to begin participation, you must complete an enrollment form directing the investment of hospital contributions with an approved insurance or investment company. You may also need to complete an application form for each approved insurance and investment company you select. Once you are eligible, contributions will become effective as of the first payroll period following

your submission of the appropriate forms.  No contributions will be made for any period before you submit the enrollment form and any other materials required for the investment of contributions.

2.3  Amount of Hospital Contributions.  For each pay period that you participate, the hospital will contribute a percentage of your pay to accounts established with the approved insurance or investment companies you select.  The percentage of pay contributed is based on the total number of years of employment as an eligible employee, whether or not consecutive, you have completed based on the following schedule:

| Completed years of employment | Percentage contribution |
|---|---|
| Less than 2 | 0% |
| 2 but less than 5 | 3% |
| 5 but less than 10 | 5% |
| 10 but less than 20 | 7% |
| 20 or more | 8% |

Through April 30, 1991, your years of employment will be determined as of the last day of the preceding month.  On or after May 1, 1991, your years of employment will be determined as of the last day of the preceding payroll period.  Your pay includes all compensation received by you from the hospital during the pay periods that you participate for the performance of services including overtime pay, shift differential, bonuses and incentive pay.  It does not include reimbursed expenses, taxable fringe benefits or any other items not constituting direct compensation for services.  Your pay will be determined before any reduction in your taxable income for employee contributions on a salary reduction basis under this plan or any other arrangement under Code Section 403(b) or Code Section 125.  However, the maximum compensation taken into account under this plan during any year is limited to $150,000, as adjusted annually by the Secretary of the Treasury to reflect increases in the cost-of-living.

The hospital's contributions to the plan for any year will be made within the time allowed by law.

2.4  Cessation of Contributions.  The hospital's contributions to the plan will stop for any pay period during which you are no longer an eligible employee.

## ARTICLE III

## PARTICIPANT CONTRIBUTIONS

3.1  Voluntary Contributions.  You are not required to contribute to the plan.  However, whether or not you are eligible for hospital contributions under Article II, you may make voluntary contributions on a salary reduction basis to accounts established with the approved insurance or investment companies you select.  Voluntary contributions reduce the amount of your salary subject to federal income tax, but do not reduce the amount subject to Social Security or Massachusetts state income taxes.  If you make voluntary contributions and are not eligible for hospital contributions under Article II, you will be considered a participant with respect to such voluntary contributions only.

3.2  Limitations on Contributions.  Your voluntary contributions may not exceed the limit under Code Section 402(g) for the year.  If your contributions for a calendar year exceed this limit because you

-2-

participate in the plan of another employer, you may file a request to withdraw the excess with the administrator no later than March 1 following such calendar year. If your contributions for a calendar year exceed this limit because of administrative error under this plan, the excess contributions will be returned to you. You will receive the excess contributions by the April 15 following the request, together with earnings allocable to the excess contributions. In addition, the total of your voluntary contributions, and the hospital contributions on your behalf (if eligible), may not exceed your exclusion allowance under Code Section 403(b) for the year or the limits under Code Section 415. At the discretion of the administrator, voluntary contributions that exceed these limits may be returned to you.

3.3  Salary Reduction Agreement. To make voluntary contributions, you must complete an enrollment form specifying the percentage of your pay that will be contributed to the plan on a salary reduction basis and directing the investment of your voluntary contributions with an approved insurance or investment company. You may also need to complete an application form for each approved insurance or investment company you select for the investment of contributions. You may change the percentage you contribute by completing a new salary reduction agreement. You may not make a change in the year you join the plan and may make only one such change in any other year. However, at any time you may revoke your salary reduction agreement and suspend voluntary contributions to the plan by written notice to the administrator. If you have revoked a salary reduction agreement, you may not make voluntary contributions again until the next year.

3.4  Transfers. Whether or not you are eligible for hospital contributions under Article II, you may transfer to the plan amounts from Code Section 403(b) annuities or custodial accounts established by other employers for whom you have worked. To make a transfer, you must complete an enrollment form which will direct the investment of your contribution with an approved insurance or investment company. You may also need to complete an application form and transfer forms for each approved insurance or investment company you select for the investment of contributions. If you make a transfer and are not eligible for hospital contributions under Article II, you will be considered a participant with respect to such transfer only.

## ARTICLE IV

## INVESTMENT OF CONTRIBUTIONS

4.1  Designation of Insurance and Investment Companies. The hospital will select one or more insurance companies or investment companies to serve as investment media under the plan. Each insurance company selected by the hospital will offer one or more annuity contracts for the investment of contributions that qualify under Code Section 403(b). In connection with the selection of an investment company, the hospital will also select a custodian to establish custodial accounts that qualify under Code Section 403(b)(7) to hold shares of the investment company in which contributions are invested. The hospital may also approve specific investment funds offered by the insurance or investment companies to participants. The hospital may change its choice of insurance or investment companies and investment funds at any time. However, any amounts you have invested at the time of the change will remain so invested unless you elect to transfer the amount to the new investments selected by the hospital.

4.2  Investment Directions. You must direct the investment of the hospital contributions made on your behalf, and any voluntary contributions or transfers made by you, with one or more of the approved insurance or investment companies. You may change your investment directions for future contributions at any time. In addition, to the extent permitted by the insurance or investment companies,

-3-

you may transfer assets among approved investment funds. Your account will be charged for any costs associated with transfers among funds. The hospital will not commence contributions on your behalf, or accept voluntary contributions or transfers, until you complete an enrollment form directing the investment of contributions and complete any application or transfer forms required by the insurance or investment companies you select.

4.3 <u>Accounts, Records and Reports</u>. The insurance or investment companies you select will maintain accounts for you. Contributions, interest, dividends, other investment gains and losses, withdrawals and expenses will be credited or charged to your accounts as provided by the terms of the annuity contract or custodial account agreement. The insurance or investment companies will periodically report to you on your accounts and will maintain records showing separately the amounts attributable to hospital contributions and your voluntary contributions, if any.

4.4 <u>Loans</u>. You cannot borrow from your hospital contributions account. However, you may borrow from your voluntary contributions account to the extent permitted by the insurance or investment companies you select. You can borrow up to one-half of the amount in your accounts, but never more than $50,000. The $50,000 limit is reduced by the highest balance of all loans outstanding from the plan to you during the preceding 12 months. The loan must provide for full repayment within 5 years (except for certain loans used to buy your principal residence) and must provide for level amortization with at least quarterly payments. All loans will be handled by the insurance or investment company you select and the hospital will have no responsibility for administration of the loan program.

ARTICLE V

DISTRIBUTIONS

5.1 <u>Commencement of Distributions</u>. When you stop working for the hospital, you may begin receiving payments from your accounts. You can also have the insurance or investment companies maintain your accounts for later payment if you want. Even if you are still working for the hospital, distribution of your accounts must begin by April 1 following the year in which you reach age 70 1/2.

5.2 <u>Form of Payment</u>. After you stop working for the hospital, you may choose to have the value of your accounts paid in any form of benefit made available by the insurance or investment companies, subject to the annuity requirements of Section 5.3. These forms may include a lump sum payment, an annuity or installment payments. Any installment payments must be made over a period no longer than the joint life expectancies of you and your designated beneficiary, or otherwise in accordance with Code Section 401(a)(9). If you are still working for the hospital when payments begin, you will receive the minimum amount needed to satisfy the requirements of Code Section 401(a)(9).

5.3 <u>Annuity Requirements</u>. If you are married when payments commence and do not choose another form of payment, your accounts will be used to purchase a 50% joint and survivor annuity from an insurance company. Under this annuity, you will receive monthly payments for your life. After your death, your surviving spouse will receive continuing monthly payments equal to 50% of the income payable during the joint lives of you and your spouse. You may waive the 50% joint and survivor annuity and choose another form of payment by filing a written election form during the 90-day period ending on the date payments commence. During this period, you may revoke your election and may make a new election after revoking a prior election. Your spouse must consent in writing to the election of another form of payment. The consent must acknowledge the effect of the consent and must be

-4-

witnessed by a plan representative or notary public. Consent is not required if you can establish that you are not married or that your spouse cannot be located.

If you are not married and do not choose another form of payment, your accounts will be used to purchase an annuity from an insurance company providing monthly payments for life with no payments made after your death.

5.4  Distribution Upon Death.  If you die before you have begun receiving benefits under the plan, your beneficiary will receive the amount in your accounts.  You may designate one or more beneficiaries and may change beneficiaries at any time by written notice to the administrator.  Any amount not paid to a designated beneficiary for any reason will be paid to your spouse if living, then to your children in equal shares (or their issue), and otherwise to your estate.

If you are married, your spouse must be the beneficiary for at least 50% of your account balances.  If you are over age 35 or if you no longer work for the hospital, you may designate your spouse to receive less than 50% of your account balances if your spouse consents in writing to the designation.  The consent must acknowledge the effect of the consent and must be witnessed by a plan representative or notary public.  Consent is not required if you can establish that you are not married or that your spouse cannot be located.

If you die after payments begin but before the complete distribution of your accounts, your designated beneficiary or beneficiaries will receive the amount remaining in your accounts.  If your accounts were used to purchase an annuity, this is considered a complete distribution of your accounts and the rights of any beneficiary upon your death will be determined in accordance with the terms of the annuity.

5.5  Withdrawal of Contributions While Working.  Except for required distributions after age 70 1/2, you may not withdraw or receive a distribution of the hospital's contributions or earnings while you are working for the hospital.

Once you reach age 59 1/2, you may withdraw all or any portion of the voluntary contributions and earnings credited to your accounts at any time.  If you are younger than age 59 1/2 and are still working for the hospital, you may withdraw up to the amount of the voluntary contributions and earnings held under an annuity contract as of December 31, 1988 at any time.  In addition, you may withdraw the voluntary contributions (but not earnings) credited to your accounts on or after January 1, 1989 if you have a financial hardship as a result of one of the following needs:

(a)  uninsured medical expenses incurred by you, your spouse or a dependent;

(b)  purchase of your principal residence (not including mortgage payments);

(c)  tuition payments for the next 12 months of post-secondary education for you or your spouse, children or dependents;

(d)  rent or mortgage payments needed to prevent eviction from or foreclosure on the mortgage on your principal residence.

To be eligible for a hardship withdrawal you must provide evidence that you have an immediate and heavy need for money and that the withdrawal is necessary to meet the need.  The withdrawal is necessary to meet the need only if you are unable to meet the need through other resources such as

-5-

insurance proceeds, reasonable liquidation of other assets, distributions or borrowing from other sources on reasonable terms or through cessation of voluntary contributions. If you receive a hardship withdrawal, your election of voluntary contributions will automatically be revoked. You may not begin voluntary contributions again until January 1 following the anniversary of the date you receive the hardship withdrawal.

All withdrawals are subject to the terms of the insurance contract or custodial account.

5.6 <u>Direct Rollovers</u>. You or your surviving spouse may elect, at the time and in the manner prescribed by the administrator, to have any portion of an eligible rollover distribution made payable directly to an eligible retirement plan you specify in a direct rollover. An eligible rollover distribution is any distribution from the plan other than an annuity, installment payments over a specified period of ten years or more or any distribution to the extent the distribution is required under Code Section 401(a)(9). An eligible retirement plan is an individual retirement account described in Code Section 408(a), an individual retirement annuity described in Code Section 408(b) or an annuity contract described in Code Section 403(b) that accepts the distributee's eligible rollover distribution. However, in the case of an eligible rollover distribution to your surviving spouse, an eligible retirement plan is an individual retirement account or individual retirement annuity. A distributee includes an employee or former employee. Your spouse or former spouse who is the alternate payee under a qualified domestic relations order ("QDRO") as defined in Code Section 414(p) may make a direct rollover of an eligible rollover distribution.

## ARTICLE VI

## PLAN ADMINISTRATION

6.1 <u>Appointment of Administrator</u>. The hospital will appoint an administrator to run the plan. The administrator may be an individual or a committee. If the administrator is a committee, it acts by majority, but formal meetings are not needed and the single signature of any member is enough to show committee action. The administrator can be a participant. The hospital will be the "plan administrator" as that term is used in ERISA.

6.2 <u>Administration of Plan</u>. The administrator has all power and authority necessary or appropriate to administer the plan. The administrator has full discretion to interpret and apply any plan provision and can adopt reasonable rules and regulations for the administration of the plan. The administrator's decisions are binding unless plainly wrong or clearly unfair.

6.3 <u>Claims Procedure</u>. This section describes the plan's claims procedure. You need this procedure only if you have a dispute about what you are entitled to under the plan.

Any request for benefits by a participant or beneficiary will be filed in writing with the administrator. Within a reasonable period after receipt of a claim, the administrator will provide written notice to any claimant whose claim has been wholly or partly denied, including: (a) the reasons for the denial, (b) the plan provisions on which the denial is based, (c) any additional material or information necessary to perfect the claim and the reasons it is necessary, and (d) the plan's claims review procedure. A claimant will be given a full and fair review by the administrator of the denial of his claim if he requests a review in writing within 60 days after notification of the denial. The claimant may review pertinent documents and may submit issues and comments orally, in writing, or both. The administrator

-6-

will render its decision on review promptly and in writing and will include specific reasons for the decision and references to the plan provision on which the decision is based.

6.4 <u>Named Fiduciaries</u>. The hospital and the administrator will be the named fiduciaries of the plan. Except as provided in ERISA Section 405(a) no fiduciary other than a named fiduciary is liable for any act or omission of any fiduciary other than himself, and except as provided in ERISA Section 405(c)(2) no named fiduciary is liable for the act or omission of any other named fiduciary or of any other fiduciary or person to whom responsibilities have been delegated.

## ARTICLE VII

## AMENDMENT AND TERMINATION

7.1 <u>Amendment of Plan</u>. The hospital can amend this plan at any time. However, no amendment can reduce the amount credited to your accounts or retroactively eliminate an optional form of benefit, except as permitted by law.

7.2 <u>Termination of Plan</u>. The hospital has established the plan with the intention that it will continue the plan indefinitely. However, the hospital reserves the right to terminate the plan or to permanently stop making contributions at any time. If the plan is terminated, you will retain all rights you have under any annuities or custodial accounts that you have.

## ARTICLE VIII

## MISCELLANEOUS

8.1 <u>Plan Year</u>. The plan year is the initial 9-month period from January 1, 1990 to September 30, 1990 and subsequent 12-month periods ending September 30 of each year.

8.2 <u>Employment in Ineligible Class</u>. If you are eligible but have service with the hospital as an ineligible employee, you may begin participation in the plan on the date you have reached age 21 and have completed two "years of service" with the hospital even though you may not have completed two years of employment as an eligible employee. A "year of service" is each separate 12-month period (beginning on the date you start work and each anniversary of that date) in which you have 1,000 "hours of service". An "hour of service" means:

(a)    Each hour for which you are paid, or entitled to payment, for the performance of duties for the hospital. These hours will be credited for the computation period in which the duties are performed;

(b)    Each hour for which you are paid, or entitled to payment, by the hospital on account of a period of time during which no duties are performed (irrespective of whether the employment relationship has terminated) due to vacation, holiday, illness, incapacity (including disability), layoff, jury duty, military duty or leave of absence. No more than 501 hours of service will be credited under this paragraph for any single continuous period (whether or not such period occurs in a single computation period). Hours under this paragraph will be calculated and credited pursuant to section 2530.200b-2(b) and (c) of the Department of Labor Regulations which are incorporated by reference; and

-7-

(c)    Each hour for which back pay, irrespective of mitigation of damages, is either awarded or agreed to by the hospital. The same hours of service shall not be credited both under paragraph (a) or paragraph (b), as the case may be, and under this paragraph (c). These hours shall be credited for the computation period or periods to which the award or agreement pertains rather than the computation period in which the award, agreement or payment is made.

8.3    No Employment Contract.    This plan does not create an employment contract with the hospital and does not give you any right to continue as an employee of the hospital. This plan does not give you any right to benefits beyond those expressly provided by the plan.

8.4    Non-Alienation.    No benefit or right under the plan can be transferred or taken in any manner, whether by your voluntary act or by legal action by any creditor or other claimant. However, these restrictions do not apply to a QDRO.

8.5    Qualified Domestic Relations Orders.    Upon receipt of a domestic relations order, the administrator will notify the participant involved and each alternate payee under the order. The administrator will determine whether the order is a QDRO and will notify each affected individual of its determination. In general, the plan's claims procedure applies to this determination and any subsequent determination relating to the order. If an order is determined to be a QDRO, the provisions of the order will take precedence over any conflicting provisions of the plan. To the extent provided in the QDRO, a former spouse will be treated as the spouse or surviving spouse of a participant for purposes of the death benefit provisions of the plan.

8.6    Impossible or Difficult Performance.    If any action required by the plan is impossible or difficult, another action may be taken which will carry out the intent as closely as possible.

8.7    Severability.    The provisions of this plan are "severable" and if any provision is invalid or in a particular situation cannot lawfully be applied, the rest of the plan or the application of the provisions in other situations will continue to operate and the offending provision or application will be disregarded.

8.8    Benefits Not Guaranteed.    The hospital and the administrator do not guarantee the payment of benefits under the plan. Benefits will be provided solely from the annuity contracts or custodial accounts under the plan.

8.9    Contributions Made in Error.    If all or a part of any contribution to the plan is made because of a mistake of fact, the amount contributed may be returned to the hospital if such return is demanded within the time allowed by law.

8.10    Plan Interpretation.    This plan is governed by Massachusetts law except where controlling federal law overrides. Headings in the plan are only for convenience and do not affect meaning. Use of singular or plural forms and the gender of pronouns are not significant in interpreting the plan unless the context clearly makes them significant.

MOUNT AUBURN HOSPITAL

By: _____

Francis P. Lynch, President

-8-

SCHEDULE A

Amendments to Plan

A.1   The plan was established effective as of January 1, 1990.

A.2   The plan was amended and restated by the First Amendment as follows:

(a)   Effective with respect to distributions made on or after January 1, 1993, to add provisions permitting direct rollovers of eligible rollover distributions.

(b)   Effective as of January 1, 1994, to   reduce the maximum amount of compensation that may be taken into account under the plan to $150,000, as indexed.

(c)   Effective as of January 1, 1995, to provide for recognition of pre-participation service for certain designated predecessor employers.

## SCHEDULE B

### Predecessor Employers

B.1    Employment with the Belmont-Watertown Visiting Nurse Association, Inc. will be considered employment with the hospital for all purposes under the plan for any person who was an employee of Belmont-Watertown Visiting Nurse Association, Inc. on November 1, 1993.

B.2    Employment with Mount Auburn Medical Associates, Inc. will be considered employment with the hospital for all purposes under the plan for any person who was an employee of Mt. Auburn Medical Associates, Inc. on April 16, 1995.

## ADDITIONAL INFORMATION

The foregoing plan document, together with this additional information, constitutes the summary plan description for RetirementPLUS.

Plan Sponsor and Plan Administrator

Mount Auburn Hospital
330 Mount Auburn Street
Cambridge, Massachusetts  02238

Telephone number:     (617) 492-3500
Employer Identification Number:  04-2103606

The hospital is the "plan administrator" as that term is defined in ERISA.  Service of process may be made on the administrator or the hospital.

Funding Vehicles

Contributions under RetirementPLUS may be invested with either of the following carriers as directed by you:

UNUM Life Insurance Company
2211 Congress Street
Portland, Maine  04122

Fidelity Investments
82 Devonshire Street
Boston, Massachusetts  02109

Basic Plan Information

Type of Plan:  Code Section 403(b) defined contribution plan

Plan Year: September 30

Plan Number:  002

PBGC Insurance

Your accounts under the plan are not insured by the Pension Benefit Guaranty Corporation ("PBGC") because the PBGC does not insure defined contribution plans like RetirementPLUS.

-11-

<u>Your Rights Under ERISA</u>

The following statement is required by federal law and regulation:

As a participant in the plan you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all plan participants shall be entitled to:

- Examine, without charge, at the plan administrator's office all plan documents, including insurance contracts, and copies of all documents filed by the plan with the U.S. Department of Labor, such as detailed annual reports and plan descriptions.

- Obtain copies of all plan documents and other plan information upon written request to the plan administrator. The administrator may make a reasonable charge for the copies.

- Receive a summary of the plan's annual financial report. The plan administrator is required by law to furnish each participant with a copy of this summary annual report.

- Obtain a statement telling you whether you have a right to receive a pension at normal retirement age (age 65) and if so, what your benefits would be at normal retirement age if you stop working under the plan now. If you do not have a right to a pension, the statement will tell you how many more years you have to work to get a right to a pension. This statement must be requested in writing and is not required to be given more than once a year. The plan must provide the statement free of charge.

In addition to creating rights for plan participants ERISA imposes duties on the people who are responsible for the operation of the plan. The people who operate the plan, called "fiduciaries" of the plan, have a duty to do so prudently and in your interest of you and that of other plan participants and beneficiaries. No one, including the hospital, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a plan benefit or exercising your rights under ERISA.

If you have a claim for benefits which is denied in whole or in part, you must receive a written explanation of the reason for the denial. You have the right to have the plan review and reconsider your claim. Under ERISA, there are steps you can take to enforce these rights. For instance, if you request materials from the plan and do not receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the plan administrator to provide the materials and pay you up to $100 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court. If it should happen that plan fiduciaries misuse the plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees (for example, if it finds your claim is frivolous).

If you have any questions about your plan, you should contact the plan administrator. If you have any questions about this statement or about your rights under ERISA, you should contact the nearest Area Office of the U.S. Labor-Management Services Administration, Department of Labor.

-12-

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11573-RWZ

ANTHONY P. SCAPICCHIO, M.D.,              )
     Plaintiff,                       )
            )
            )
v.                                        )
            )
MOUNT AUBURN PROFESSIONAL                 )
SERVICES, a Massachusetts non-            )
profit corporation, MOUNT AUBURN          )
HOSPITAL, a hospital incorporated         )
in Massachusetts, for itself and as       )
administrator of the Mount Auburn         )
Hospital RetirementPlus 403(b)            )
Plan, and THOMAS FABIANO,                 )
     Defendants.                      )
            )

## NOTICE OF PLAINTIFF ANTHONY P. SCAPICCHIO, M.D., THAT HE INTENDS TO PROCEED WITH THIS LITIGATION

### EXHIBIT D

Calculation of Lost Retirement Funds, as calculated by Dan Clasby

# DAN CLASBY & COMPANY

100 Cummings Center, Suite 238C
Beverly, MA 01915
Phone (978) 922-9900  Fax (978) 922-3233

# Fax

TO: Anthony Scapicchio          FROM: Dan

CC:                              PAGES: 3

FAX: 617 236 - 6391             DATE: 12/10/04

RE:                              CC:

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

● Comments:

12/10/2004  11:01    978-322-3233    DAN CLASBY AND CO

**ANTHONY SCAPICCHIO, M.D.**
**LOST MAH CONTRIBUTIONS**
**1995 THROUGH 2002**

| YEAR | EARNINGS LIMIT | CONTRIBUTION RATE | CONTRIBUTION | RETURN | CONTRIBUTION PLUS EARNINGS | CUMULATIVE BALANCE |
|------|------|------|------|------|------|------|
| 1995 | 150,000 | 8% | 12,000 | 7.5% | 12,900 | 12,900.00 |
| 1996 | 150,000 | 8% | 12,000 | 6.9% | 12,828 | 26,618.10 |
| 1997 | 160,000 | 8% | 12,800 | 6.6% | 13,645 | 42,019.69 |
| 1998 | 160,000 | 8% | 12,800 | 6.2% | 13,594 | 58,218.52 |
| 1999 | 160,000 | 8% | 12,800 | 5.8% | 13,542 | 75,137.59 |
| 2000 | 170,000 | 8% | 13,600 | 5.5% | 14,348 | 93,618.16 |
| 2001 | 170,000 | 8% | 13,600 | 5.1% | 14,294 | 112,686.28 |
| 2002 | 200,000 | 8% | 16,000 | 4.7% | 16,752 | 134,734.54 |

CUMULATIVE BALANCE MAH & EE CONTRIBUTION AS OF 12/31/02     238,706.37

PROJECTED YEAR END BALANCES USING 3.5% RETURN
MAH & EE CONTRIBUTIONS

| | |
|------|------|
| 2003 | 247,061.09 |
| 2004 | 255,708.23 |
| 2005 | 264,658.01 |
| 2006 | 273,921.04 |
| 2007 | 283,508.28 |

ANTHONY SCAPICCHIO, M.D.
LOST EMPLOYEE VOLUNTARY CONTRIBUTIONS
1995 THROUGH 2002

| YEAR | LIMIT | RETURN | CONTRIBUTION PLUS EARNINGS | CUMULATIVE BALANCE |
|------|-------|--------|----------------------------|--------------------|
| 1995 | 9,000 | 7.5% | 9,675 | 9,675.00 |
| 1996 | 9,500 | 6.9% | 10,156 | 20,498.08 |
| 1997 | 9,500 | 6.6% | 10,127 | 31,977.95 |
| 1998 | 10,000 | 6.2% | 10,620 | 44,580.58 |
| 1999 | 10,000 | 5.8% | 10,580 | 57,746.25 |
| 2000 | 10,500 | 5.6% | 11,088 | 72,068.04 |
| 2001 | 11,000 | 5.1% | 11,561 | 87,304.51 |
| 2002 | 12,000 | 4.7% | 12,564 | 103,971.83 |