UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11573-RWZ

_____
ANTHONY P. SCAPICCHIO, M.D.,        )
            Plaintiff,              )
                                    )
v.                                  )
                                    )
MOUNT AUBURN PROFESSIONAL           )
SERVICES, a Massachusetts non-      )
profit corporation, MOUNT AUBURN    )
HOSPITAL, a hospital incorporated   )
in Massachusetts, for itself and as )
administrator of the Mount Auburn   )
Hospital RetirementPlus 403(b)      )
Plan, and THOMAS FABIANO,           )
            Defendants.             )
_____)

### MEMORANDUM OF LAW SUBMITTED BY PLAINTIFF ANTHONY P. SCAPICCHIO, M.D. IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Now comes the Plaintiff, Anthony P. Scapicchio, M.D., and, in accordance with Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, submits this memorandum of law in support of his motion for summary judgment, which has been filed herewith.

### STATEMENT OF FACTS

Dr. Scapicchio also has filed herewith, pursuant to Local Rule 56.1, a Statement of Undisputed Material Facts ("SUMF") with a supporting Affidavit of Dr. Scapicchio and other exhibits, in further support of his Motion for Summary Judgment. The SUMF is incorporated by reference herein. The following recitation of pertinent facts is supported by the SUMF filed herewith, with references to the same.

Dr. Scapicchio is a medical physician who was continuously employed by Defendants Mount Auburn Hospital ("MAH") and Mount Auburn Professional Services ("MAPS") from 1974 until 2002, during which time he was progressively assigned to prominent medical and administrative positions of increased responsibility. See SUMF, at ¶¶1-7. He became the chief of emergency services at MAH in 1974, subsequently was assigned the role of chief of ambulatory services at MAH in 1976, and was promoted to chairman of the department of ambulatory services for MAH in 1987, when MAH elevated its ambulatory services division to hospital departmental status. See SUMF, at ¶¶3-5. Dr. Scapicchio then became chairman emeritus of the department of emergency medicine at MAH in 1989, while remaining a full-time staff physician at the hospital. See SUMF, at ¶6. As a result of Dr. Scapicchio's medical and administrative positions at MAH, he played a managerial role in all phases of MAH's operations, including design, planning, staffing, and clinical and fiscal integrity. See SUMF, at ¶2. On approximately August 10, 1990, Dr. Scapicchio entered into a written employment agreement with Defendant MAPS, which had entered into an agreement with MAH to provide emergency medical services, medical teaching services, and hospital administrative services within MAH's department of emergency medicine. See SUMF, at ¶¶7.

MAH began offering its employees, including its physicians, a pension plan in 1964, which it revised on approximately October 1, 1976. See SUMF, at ¶8. At that time, MAH provided all of its employees, including Dr. Scapicchio, with a written pension plan summary that reflected the October 1, 1976 revisions. See SUMF, at 8. As reflected in the written pension plan summary distributed to MAH's employees in 1976, MAH's pension plan provided that, in the case of an employee's disability prior to

retirement, the employee would "continue to be included in the [Pension] Plan and to earn Retirement Credits based upon [the employee's] last Annual Salary." See SUMF, at ¶¶9.

MAH subsequently established, on January 1, 1990, a defined contribution, individual account retirement plan known as the RetirementPLUS Plan ("the Retirement Plan") for its eligible employees, including Dr. Scapicchio. See SUMF, at ¶10. The Retirement Plan obligated MAH to furnish its eligible employees, including Dr. Scapicchio, with an employer contribution to each employee's individual retirement account, based on the individual employee's annual compensation and length of service with MAH. See SUMF, at ¶¶11. As of 1995, when Dr. Scapicchio had more than 20 years of service at MAH, he was entitled to an employer contribution from MAH in the amount of 8% of his annual compensation, which was $161,232.72. See SUMF, at ¶¶11-12.

As part of Dr. Scapicchio's administrative responsibilities at MAH, and in an attempt to recruit the most highly qualified physicians, Dr. Scapicchio was personally involved in the development of the Retirement Plan. See SUMF, at ¶¶2, 13. The intent of the Retirement Plan developers was to ensure a fully funded retirement plan for MAH's employees, including Dr. Scapicchio. See SUMF, at ¶14.

The Retirement Plan identified employees who were eligible to participate as those who had worked at MAH for at least two years and were regularly scheduled to work at least 20 hours week. See SUMF, at ¶15. Paragraph 2.4 of the Retirement Plan, captioned "Cessation of Contributions", states, in full, "[T]he hospital's contributions to

3

the plan will stop for any pay period during which you are no longer an eligible employee." See SUMF, at ¶16.

Paragraph 6.2 of the Retirement Plan states, in part, that "[t]he [Plan] administrator's decisions are binding unless plainly wrong or clearly unfair", and Paragraph 6.3 of the Retirement Plan, which is captioned "Claims Procedure", requires the Retirement Plan administrator to reduce any denial of benefits into a written notice to the claimant that includes the reasons for the denial, the plan provisions on which the denial was based, any additional material or information necessary to perfect a claim and the reasons it is necessary, and the plan's claims review procedure. See SUMF, at ¶18. Paragraph 6.3 of the Retirement Plan also provides that a claimant "will be given a full and fair review by the administrator of the denial of his claim if he requests a review in writing within 60 days after notification of the denial. … The administrator will render its decision on review promptly and in writing and will include specific reasons for the decision and references to the plan provision on which the decision is based." See SUMF, at ¶18.

The aforementioned written employment agreement entered into between Dr. Scapicchio and MAPS in 1990 automatically renewed on an annual basis, and included an Exhibit B that confirmed employee physicians such as Dr. Scapicchio were entitled to take advantage of both (1) long-term disability insurance fully paid for by MAH and (2) the Retirement Plan. See SUMF, at ¶21. Exhibit B to the employment agreement between Dr. Scapicchio and MAPS further states, in its description of the Retirement Plan, that "after two years of service at a minimum of 20 hours per week, employees

4

receive a contribution from the hospital to a 403b tax-deferred annuity account in their name." See SUMF, at ¶22.

MAH began offering a new long-term disability plan ("the LTD Plan") for its employees, including Dr. Scapicchio, in 1994. See SUMF, at ¶23. The LTD Plan was briefly summarized in a memorandum, dated August 18, 1994, that was drafted by MAH's Director of Compensation and Benefits, Susan Glover, and distributed to all MAH employees. See SUMF, at ¶24. This August 18, 1994 memorandum stated that "[d]etailed booklets describing all of the life and long-term disability insurance plans will be provided to plan participants this fall." See SUMF, at ¶24. The open enrollment period for the LTD Plan was August 22, 1994 through September 21, 1994, with coverage effective October 1, 1994. See SUMF, at ¶25. During the open enrollment period, Dr. Scapicchio requested, on at least three occasions, a written copy of the LTD Plan and/or the detailed plan booklet promised in Ms. Glover's August 18, 1994 memorandum, but he never received any such written copy or detailed booklet. See SUMF, at ¶26. Moreover, Dr. Scapicchio was informed by an administrator who worked in MAH's employee benefits office, Nancy Stryker, that no written copy of the LTD Plan, or written summary or detailed booklet of the same, would be provided to Dr. Scapicchio or any other MAH employee prior to September 21, 1994, when the open enrollment period expired. See SUMF, at ¶27. Dr. Scapicchio subsequently enrolled in the LTD Plan prior to the enrollment deadline of September 21, 1994, despite the fact that he had not been afforded an opportunity to see either a written copy of the LTD Plan or the promised detailed booklet regarding the same. See SUMF, at ¶28. At that time, Dr.

5

Scapicchio also purchased supplemental coverage under the LTD Plan, at his own expense. See SUMF, at ¶29.

As a result of progressive major depression, Dr. Scapicchio was forced to take an emergency, 20-week medical leave of absence from his duties at MAH in January 1995. See SUMF, at ¶30. His last day of work at MAH was January 12, 1995. See SUMF, at ¶30. Unfortunately, Dr. Scapicchio's progressive major depression did not improve during his emergency medical leave of absence. See SUMF, at ¶31. Consequently, and upon the recommendation of MAH's administrators in the employee benefits office, Dr. Scapicchio applied for long-term disability status pursuant to the LTD Plan. See SUMF, at ¶31. His application for the LTD Plan was dated April 20, 1995, when he was 58 years old. See SUMF, at ¶31.

As Dr. Scapicchio was contemplating whether he should apply for disability status under the LTD Plan, he needed and sought information and guidance from the employee benefits office at MAH; Dr. Scapicchio's need for this information was caused by the fact that, despite his repeated requests, he had never been provided with either a copy of the LTD Plan or a copy of the detailed booklet referenced in the August 18, 1994 memorandum distributed by Susan Glover, MAH's Director of Compensation and Benefits. See SUMF, at ¶32. While Dr. Scapicchio was conferring with the employee benefits office of MAH, he specifically discussed his situation with Nancy Stryker, who worked in that office. See SUMF, at ¶33.

Mrs. Stryker initially informed Dr. Scapicchio that he would receive long-term disability payments, under the LTD Plan, until his death. See SUMF, at ¶33. Dr. Scapicchio, who had played a managerial and administrative role at MAH since 1974,

6

realized that it was unlikely that his disability benefits would last until his death. See SUMF, at ¶¶1-6, 34. Consequently, Dr. Scapicchio asked Ms. Stryker to confirm this issue with a representative from Liberty Mutual Insurance Company, which funded the LTD Plan on behalf of MAH. See SUMF, at ¶34. Ms. Stryker subsequently telephoned the Liberty Mutual representative responsible for the LTD Plan, while Dr. Scapicchio remained in her office. See SUMF, at ¶35. As a result of this telephone discussion between Ms. Stryker and the representative from Liberty Mutual, Dr. Scapicchio learned that his disability benefits with continue only until he reached 65 years of age. See SUMF, at ¶36.

After further reviewing his options and conferring with MAH's employee benefits office, Dr. Scapicchio submitted his application for long-term disability status under the LTD Plan. See SUMF, at ¶31. In his application, Dr. Scapicchio acknowledged that, due to his condition of progressive major depression, he was no longer able to fulfill his professional duties as a physician. See SUMF, at ¶38. While Dr. Scapicchio was determining whether he should apply for disability status under the LTD Plan, Ms. Stryker encouraged him to do so and informed him that, during his period of disability under the LTD Plan, MAH would continue to fund his retirement account pursuant to the Retirement Plan. See SUMF, at ¶37.

On July 10, 1995, Dr. Scapicchio received written notification that his application for disability status under the LTD Plan had been approved. See SUMF, at ¶39. Since Dr. Scapicchio's last date of work at MAH was January 25, 1995, and the LTD Plan required a waiting period 90 days before he was eligible to begin receiving disability benefits, Dr. Scapicchio was entitled to commence receiving disability payments on April

13, 1995.  See SUMF, at ¶¶40-42.  Throughout this process, Dr. Scapicchio continued to request a copy of either the LTD Plan or the written booklet summarizing the same, which had been promised in the August 18, 1994 memorandum distributed by Susan Glover, MAH's Director of Compensation and Benefits.  See SUMF, at ¶¶24, 43.

By letter dated August 9, 1995, one month after he had received notification that his application for disability benefits had been approved, Dr. Scapicchio received a copy of the long-term disability contract between MAH and Liberty Mutual.  See SUMF, at ¶44.  Significantly, in that same letter, Dr. Scapicchio was notified, for the first time, that the LTD Plan included a two-year limitation for disability caused by mental illness.  See SUMF, at ¶44.  Consequently, the LTD Plan would only cover Dr. Scapicchio's disability, which was progressive major depression, for a two-year period following the allowance of disability benefits.  See SUMF, at ¶44.  Accordingly, Dr. Scapicchio's disability payments were discontinued on April 13, 1997.  See SUMF, at ¶45.  Dr. Scapicchio's disability benefits eventually were restored approximately 9½ months later, in January 1998, when he was diagnosed as being disabled due to obstructive sleep apnea and daytime somnolence.  See SUMF, at ¶46.

After Dr. Scapicchio's disability benefits were restored in January 1998, he remained on long-term disability under the LTD Plan until December 18, 2002, when he turned 65 years old.  See SUMF, at ¶47.  MAH continued to pay Dr. Scapicchio, and issue annual W-2 forms to him, until he reached his 65th birthday in 2002.  See SUMF, at ¶49.

On August 2, 2002, approximately 4 months before Dr. Scapicchio's 65th birthday, he learned, for the first time, that MAH stopped making contributions to his

8

retirement account under the Retirement Plan in August 1995. MAH had made contributions to Dr. Scapicchio's retirement account from the time he became disabled in January 1995 until July 1995, but then ceased making such contributions without providing any notice to Dr. Scapicchio. See SUMF, at ¶¶50, 51. Consequently, on August 12, 2002, Dr. Scapicchio sent a claim letter to Jeanette Clough, the president of MAH, in which he requested an explanation as to why MAH, without his knowledge or approval, ceased making contributions to his retirement account in July 1995. See SUMF, at ¶52.

Dr. Scapicchio's August 12, 2002 claim letter went unanswered until October 15, 2002, when Dr. Scapicchio received a letter response from Defendant Thomas Fabiano, the administrator of the Retirement Plan. See SUMF, at ¶53. In his October 15, 2002 letter to Dr. Scapicchio, Mr. Fabiano denied any liability for the employer retirement contributions that were not made by MAH between August 1995 and December 2002. See SUMF, at ¶53. In support of this denial, Mr. Fabiano alleged that Dr. Scapicchio ceased being paid or compensated by MAH upon the inception of long-term disability benefits under the LTD Plan and, therefore, MAH no longer was responsible for making any employer contributions to Dr. Scapicchio's retirement account because Dr. Scapicchio was no longer an employee of MAH or MAPS.. See SUMF, at ¶54.

Under cover of letter dated January 31, 2003, Thomas Fabiano provided Dr. Scapicchio – for the first time – with the summary plan description for the LTD Plan that had been promised in Susan Glover's August 18, 1994 memorandum; the summary plan description indicated a publication date of June 15, 1995, approximately 6 months after

9

Dr. Scapicchio began his emergency medical leave of absence and approximately 3 months after Dr. Scapicchio applied for benefits under the LTD Plan. See SUMF, at ¶55.

## ARGUMENT

The Defendants' stance in this matter, reduced to its most basic terms, is that MAH employees who become disabled during the course of their employment must forego either the disability benefits offered by the LTD Plan or employer contributions under the Retirement Plan. Although MAH employees who became disabled between 1964 and 1989, when MAH's previous pension plan was in effect, were entitled to continue accruing retirement credits during a period of disability, the Defendants now maintain that the Retirement Plan established by MAH in 1990 stripped its employees of this protection and, consequently, MAH's most vulnerable employees – namely, those who become disabled while working for the hospital – are no longer entitled to employer retirement contributions.

Despite the Defendants' current position, the facts set forth above and in the Statement of Undisputed Material Facts filed herewith clearly establish that the LTD Plan and the Retirement Plan were intended by the Defendants to be integrated documents designed to ensure that MAH's employees would be, in the case of a long-term disability, provided with disability benefits until the normal retirement age of 65 years and, upon reaching the age of 65 years, provided with a fully funded retirement plan. If MAH had not intended the documents to be so integrated, then the LTD Plan would have provided long-term disability benefits until the disabled employee's death, as Ms. Stryker initially advised Dr. Scapicchio.

As noted above and in the accompanying Statement of Undisputed Material Facts, the pension plan utilized by MAH from 1964 through 1989 explicitly provided that disabled employees would continue to accrue their normal retirement credits.  Given the related facts that (1) the developers of the Retirement Plan intended to provide MAH's employees with a fully funded retirement account and (2) the LTD Plan furnished by MAH provided disabled employees with long-term disability benefits until the normal retirement age of 65 years, MAH's current argument that employer retirement contributions were intended to cease upon an employee's disability simply is not credible.  Moreover, MAH's decision to fund Dr. Scapicchio's retirement account from January 1995 through July 1995, despite the fact that Dr. Scapicchio became disabled and last worked at MAH on January 12, 1995, further establishes that employer contributions under the Retirement Plan were intended to continue during an employee's disability.  As set forth in more detail below, the Defendants' failure to provide Dr. Scapicchio's retirement account with such employer contributions during his period of disability constitutes an ongoing violation of applicable law, for which the Defendants are liable to Dr. Scapicchio.

I.  **The Defendants' argument that the long term disability payments Dr. Scapicchio received from 1995 to 2002 do not constitute "pay" or "compensation" from the Defendants is without legal merit.**

As alleged by Mr. Fabiano in his October 15, 2002 denial of Dr. Scapicchio's claim, the rationale for the Defendants' failure to fund Dr. Scapicchio's retirement account during his period of disability is that, upon the commencement of Dr. Scapicchio's disability payments, he ceased being compensated by MAH.  According to the Defendants, since Dr. Scapicchio was no longer being compensated by MAH during

11

his period of disability, MAH had no obligation to continue funding Dr. Scapicchio's retirement account. The Defendants' position is facially self-serving, and ignores clear documentary and regulatory evidence that the long-term disability benefits paid to Dr. Scapicchio between 1995 and 2002 constitute compensation from his employer.

As an initial matter, the documentary record indisputably reveals that, from 1995 through 2002, MAH issued W-2 forms to Dr. Scapicchio that identified MAH and/or MAPS as Dr. Scapicchio's employer and reflected compensation paid to Dr. Scapicchio by MAH and/or MAPS. These W-2 forms also listed employer identification numbers for MAH and/or MAPS, and they all identified Dr. Scapicchio as the employee to whom compensation was paid.

Moreover, the Department of Labor has promulgated regulations, set forth at 29 C.F.R. 2530.200b-2, that pertain to employee pension benefit plans and state that, with regard to an employer's payment for employee service during a plan year, "a payment shall be deemed to be made by or due from an employer regardless of whether such payment is made by or due from the employer directly, or indirectly through, among others, a trust fund, or insurer, to which the employer contributes or pays premiums and regardless of whether contributions made or due to the trust fund, insurer or other entity are for the benefit of particular employees or are on behalf of a group of employees in the aggregate." See 29 C.F.R. 2530.200b-2(a)(2). Similarly, MAH's pension plan from 1964 through 1989 clearly provided that employees who became disabled would continue to accrue retirement benefits.

In sum, Dr. Scapicchio remained an employee of MAH and MAPS until he reached his 65th birthday on December 18, 2002, and the long term disability payments

he received between 1995 and 2002 constituted compensation from his employer. Consequently, Dr. Scapicchio was, at all times between 1995 and 2002, an employee of MAH and MAPS, and, as such, he was entitled to continue receiving employer contributions under the Retirement Plan.

II. **The Defendants' failure to fund Dr. Scapicchio's retirement account after he became disabled constitutes discriminatory conduct in violation of the Employee Retirement Income Security Act of 1974 and the Americans with Disabilities Act of 1990.**

The Defendants, by virtue of ceasing Dr. Scapicchio's employer retirement contributions when he became disabled while continuing to fund the accounts of non-disabled employees, have violated the prohibitions against discrimination set forth in both the Employee Retirement Income Security Act of 1974, as codified at 29 U.S.C. 1001 *et seq.* ("ERISA"), and the Americans with Disabilities Act, as codified at 42 U.S.C. 12101 *et seq.* ("ADA").

*1. The Defendants' Violation of ERISA*

Section 510 of ERISA, which is codified at 29 U.S.C. 1140, makes it "unlawful for any person to … discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan … or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan…." The activity prohibited by Section 510, as quoted above, has indisputably been undertaken by the Defendants in this matter. More specifically, the Defendants have deprived Dr. Scapicchio of his right to employer contributions under the Retirement Plan, and they have done so because he became disabled and sought benefits under the LTD Plan.

As the First Circuit Court of Appeals has established, Section 510 of ERISA renders an act discriminatory if the act "intentionally benefit[s], or injur[ies], certain identified employees or a certain group of employees." *Aronson v. Servus Rubber, Div. of Chromalloy*, 730 F.2d 12, 16 (1st Cir. 1984), cert. denied 469 U.S. 1017, 105 S.Ct. 431, 83 L.Ed.2d 357 (1984).  Moreover, the scope of Section 510 "reaches a broad range of employer conduct including clams premised on the discriminatory modification of a pension or retirement plan that intentionally benefits or injures certain identified employees." *Vartanian v. Monsanto Co.*, 880 F.Supp. 63, 71 (D.Mass. 1995), citing *Aronson*, 730 F.2d at 16.

The Defendants in this matter clearly have violated Section 510 of ERISA by, without limitation, excluding disabled employees such Dr. Scapicchio from continued participation in the employer-contribution component of the Retirement Plan.  The Defendants' unlawfully discriminatory conduct is particularly notable, and egregious, in light of both (1) the fact that employees who became disabled prior to 1989 are eligible for full retirement benefits under the pension plan in effect from 1964 until 1989 and (2) the integrated nature of the current LTD Plan and the current Retirement Plan, which was designed and intended to provide all employees with a fully-funded retirement plan.

  2. *The Defendant's Violation of ADA*

The ADA expressly includes, within its scope of prohibited conduct, any act that discriminates against a disabled employee such as Dr. Scapicchio "with regard to … employee compensation … and other terms, conditions, and privileges of employment." See 42 U.S.C. 12112(a).  The ADA defines discrimination, within this context, as including (1) conduct that "limit[s], segregate[es], or classif[ies] a[n] … employee in a

14

way that adversely affects the opportunities or status of such … employee because of the disability of such … employee," (2) "participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified … employee with a disability to the discrimination prohibited by this subchapter (such relationship includes a relationship with … an organization providing fringe benefits to an employee of the covered entity…)", and (3) conduct that involves "utilizing standards, criteria, or methods of administration (A) that have the effect of discrimination on the basis of disability; or (B) that perpetuate the discrimination of others who are subject to common administrative control."  See 42 U.S.C. 12112(b)(1-3).  See, also, *Carparts Distribution Center, Inc. v. Automotive Wholesalers' Ass'n of New England, Inc.*, 37 F.3d 12, 15-18 (1st Cir. 1994) (addressing scope and applicability of ADA to claims based upon wrongful deprivation of employee fringe benefits).

Again, the Defendants' decision to deprive Dr. Scapicchio of his employer retirement contributions when he became disabled clearly violates the provisions of ADA quoted above, because the Defendants' decision has the discriminatory effect of eliminating Dr. Scapicchio's right to retirement benefits while maintaining such benefits for both MAH's non-disabled employees and those employees of MAH who became disabled while under the pension plan in effect from 1964 through 1989.

**III.    The Defendants are estopped from denying Dr. Scapicchio's claim for retirement benefits because, without limitation, Dr. Scapicchio was advised by MAH's employee benefits office that he would continue receiving employer retirement contributions while he was on long term disability.**

As noted above and in the accompanying Statement of Undisputed Material Facts, Dr. Scapicchio sought, and received, guidance and advice from MAH's employee benefits office while he was contemplating whether to apply for long-term disability

15

benefits under MAH's LTD Plan.  During this process, Nancy Stryker, an employee of MAH who worked in the employee benefits office, advised Dr. Scapicchio that he would continue to receive employer contributions to his retirement account while he was disabled.  Dr. Scapicchio relied on this advice, and his reliance was reasonable in light of Ms. Stryker's position in the employee benefits office and the fact that he still had not received, despite his repeated requests, a copy of the LTD Plan or any summary thereof.  As noted above, Susan Glover, MAH's Director of Compensation of Benefits, had promised in an August 18, 1994 memorandum that a "detailed booklet" regarding the LTD Plan would be made available to all MAH employees during autumn 1994.

The Defendants are bound by Ms. Stryker's advice to Dr. Scapicchio, because, at the time she rendered the advice, she was an administrator in MAH's employee benefits office.  See, e.g., *Law v. Ernst & Young*, 956 F.2d 364, 372-374 (1st Cir. 1994).  Moreover, and as noted above, Dr. Scapicchio reasonably relied upon Ms. Stryker's statement to him, and he undertook an act as a result of that advice – namely, applying for long term disability benefits – that proved to be detrimental when the Defendants subsequently terminated his retirement benefits.  As such, Dr. Scapicchio has established an estoppel claim against the Defendants, which precludes them from denying liability under his claim for retirement contributions.  See *Law*, 956 F.2d at 368.  Moreover, Dr. Scapicchio's estoppel claim is applicable in this ERISA action, because Ms. Stryker's misrepresentation regarding the effect of Dr. Scapicchio's decision to seek long term disability benefits "constituted a plausible interpretation, not a modification, of the" Retirement Plan.  Id., at 369, citing *Kane v. Aetna Life Ins.*, 893 F.2d 1283 (11th Cir. 1990).  Consequently, Dr. Scapicchio is entitled to recover against the Defendants

pursuant to 29 U.S.C. 1132(a)(3)(B), which authorizes a participant, such as Dr. Scapicchio, to obtain equitable relief in order to redress a violation of ERISA and/or the Retirement Plan.  See *Law*, 956 F.2d at 369.

**IV.     Defendant Thomas Fabiano's conduct in this matter has been arbitrary and capricious and, therefore, Mr. Fabiano is personally liable to Dr. Scapicchio for all resultant damages incurred by Dr. Scapicchio.**

Mr. Fabiano has acted arbitrarily and capriciously in this matter by, without limitation, denying Dr. Scapicchio's claim on the ground that the disability payments he received between 1995 and 2002 do not constitute compensation; as set forth above, this contention is without merit, and stands in stark contrast to the documentary evidence and regulatory guidance.  Paragraph 6.2 of the Retirement Plan states, in part, that "[t]he [Plan] administrator's decisions are binding unless plainly wrong or clearly unfair."  As intimated by Paragraph 6.2, the Plan administrator's discretion is not unfettered, and the Plan administrator will be deemed to have acted arbitrarily and capriciously unless his denial of Dr. Scapicchio's claims "is reasonable and supported by substantial evidence." *Glista v. Unum Life Ins. Co. of America*, 378 F.3d 113, 126 (1st Cir. 2004), citing *Gannon v. Metro Life Ins. Co.*, 360 F.3d 211, 212-213 (1st Cir. 2004).  Dr. Fabiano has not satisfied this standard because, as set forth above, his contention that the disability benefits received by Dr. Scapicchio do not constitute employer compensation is neither reasonable nor supported by substantial evidence.  Consequently, Mr. Fabiano is personally liable to Dr. Scapicchio for all damages that Dr. Scapicchio has incurred, and continues to incur, as a result of Mr. Fabiano's unfounded, arbitrary, and capricious decision to deny Dr. Scapicchio's claim for retirement benefits.  *Glista*, 378 F.3d. at 125-126.

## CONCLUSION

For the reasons set forth above, Plaintiff Anthony P. Scapicchio, M.D., respectfully moves this Honorable Court to enter summary judgment, in his favor and against all three defendants, on Dr. Scapicchio's clams against the Defendants pursuant to the Employee Retirement Income Security Act of 1974 and the Americans with Disabilities Act of 1990.

Respectfully submitted,
**ANTHONY P. SCAPICCHIO, M.D.**
By his attorney,

/s/ John S. Day
_____

John S. Day (BBO #639249)
167 Washington Street
Norwell, MA 02061
781-878-6541 (telephone)
781-846-0780 (facsimile)
jday@attorneyday.com (electronic mail)

Date:   January 21, 2005

**CERTIFICATE OF SERVICE**

I, John S. Day, hereby certify that on the 21st day of January, 2005, I caused a copy of the foregoing to be served, by electronic filing, upon Philip M. Cronin, Peabody & Arnold, 30 Rowes Wharf, 6th Floor, Boston, Massachusetts 02110.

/s/ John S. Day
_____
John S. Day