UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11573-RWZ

_____
ANTHONY P. SCAPICCHIO, M.D.,        )
                    Plaintiff,      )
                                    )
v.                                  )
                                    )
MOUNT AUBURN PROFESSIONAL           )
SERVICES, a Massachusetts non-      )
profit corporation, MOUNT AUBURN    )
HOSPITAL, a hospital incorporated   )
in Massachusetts, for itself and as )
administrator of the Mount Auburn   )
Hospital RetirementPlus 403(b)      )
Plan, and THOMAS FABIANO,           )
                    Defendants.     )
_____)

**STATEMENT OF UNDISPUTED MATERIAL FACTS SUBMITTED BY PLAINTIFF ANTHONY P. SCAPICCHIO, M.D. IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Now comes the Plaintiff, Anthony P. Scapicchio, M.D., and, in accordance with Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, submits the following statement of undisputed material facts in support of the motion for summary judgment that Dr. Scapicchio has filed herewith:

**Dr. Scapicchio's Professional History**

1. Anthony P. Scapicchio, M.D. was, at all times relevant to this litigation, a medical physician employed by Defendants Mount Auburn Hospital ("MAH") and, subsequently, Mount Auburn Professional Services ("MAPS"). See Affidavit of Anthony P. Scapicchio, M.D. (Scapicchio Aff."), attached hereto as Exhibit A, at ¶¶2-7.

2. As a full-time physician and administrator, Dr. Scapicchio played a managerial role in all phases of MAH's operations, including design, planning, staffing, and clinical and fiscal integrity. See Exh. A., at ¶6. See, also, Curriculum Vitae of Anthony P. Scapicchio, attached hereto as Exhibit B, and July 31, 1989 excerpt from the Mount Auburn Hospital Weekly Monitor, attached hereto as Exhibit C.

3. Dr. Scapicchio became the chief of emergency services for MAH in 1974. See Exh. A, at ¶2.

4. Dr. Scapicchio became the chief of ambulatory services for MAH in 1976. See Exh. A, at ¶3.

5. Dr. Scapicchio was promoted to chairman of the department of ambulatory services for MAH in 1987, when MAH elevated its ambulatory services division to hospital departmental status. See Exh. A, at ¶4.

6. Dr. Scapicchio became chairman emeritus, department of emergency medicine, for MAH in 1989, and remained a full-time staff physician at MAH. See Exh. A, at ¶5.

7. On approximately August 10, 1990, Dr. Scapicchio entered into a written employment agreement ("the employment agreement") with MAPS, which had entered into an agreement with MAH to provide emergency medical services, medical teaching services, and hospital administrative services within MAH's department of emergency medicine. See Exh. A, at ¶7. See, also, August 10, 1990 letter employment agreement between Dr. Scapicchio and MAPS, attached hereto as Exhibit D.

**Pension and Retirement Plans offered by MAH**

8. On approximately October 1, 1976, MAH revised its then-extant pension plan, which had been in effect since 1964, and provided its employees, including Dr. Scapicchio, with a written pension plan summary. See October 1, 1976 Pension Plan Booklet, attached hereto as Exhibit E.

9. The pension plan summary distributed at the time of the 1976 revision stated that, "[i]f you become disabled before retirement, you will continue to be included in the [Pension] Plan and to earn Retirement Credits based upon your last Annual Salary if you fulfill the following requirements: (1) you receive payments under the hospital's Long-term Disability Program; (2) you are entitled to receive Social Security Disability payments; and (3) you have not elected to receive a refund of your contributions (applicable only to Plan members prior to October 1, 1976)." See Exh. E, at p. 13.

10. MAH subsequently established, on January 1, 1990, a defined contribution, individual account retirement plan retirement plan known as the RetirementPLUS Plan ("the Retirement Plan") for its eligible employees, including Dr. Scapicchio. See RetirementPlus plan, attached hereto as Exhibit F.

11. Under the terms of the Retirement Plan, MAH employees with Dr. Scapicchio's length of service as of 1995 generally were entitled to an employer contribution from MAH in the amount of eight percent (8%) of his annual compensation to their retirement accounts, with the limitation that "the maximum compensation taken into account under this [P]lan during any year is limited to $150,000, as

adjusted annually by the Secretary of the Treasury to reflect increases in the cost-of-living." See Exh. F., at ¶2.3.

12. Dr. Scapicchio's annual compensation as of 1995, when he went on disability, was $161,232.72.  See Exh. A, at ¶18.  See, also, March 12, 2003 memorandum from Thomas Fabiano to Jolene Ballou, attached hereto as Exh. G.

13. Dr. Scapicchio had been personally involved in the development of the Retirement Plan in his capacity as head of emergency services at MAH, and he played a leading role in developing the Retirement Plan so that MAH could recruit highly qualified physicians.  See Exh. A, at ¶9.

14. The intent of the Retirement Plan developers was to ensure a fully funded retirement plan for MAH's employees, including Dr. Scapicchio.  See Exh. A, at ¶10.

15. The introductory statement to the Retirement Plan states:

> The plan provides for contributions by the hospital and voluntary contributions by participants.  In general, hospital contributions are made for employees (others [sic] than students) who are regularly scheduled to work at least 20 hours per week, have reached age 21 and have worked at the hospital for at least two years.  The amount of the contribution is a percentage of pay based on your years of employment with the hospital….

See Exh. F, at ¶1.3.

16. Paragraph 2.4 of the Retirement Plan, which is captioned "Cessation of Contributions", states, in full, "The hospital's contributions to the plan will stop for any pay period during which you are no longer an eligible employee." <u>See</u> Exh. F, at ¶2.4.

17. Paragraph 6.2 of the Retirement Plan, which is captioned "Administration of Plan", states, in part, that "[t]he [Plan] administrator's decisions are binding unless plainly wrong or clearly unfair." <u>See</u> Exh. F, at ¶6.2

18. Paragraph 6.3 of the Retirement Plan, which is captioned "Claims Procedure," states:

> Any request for benefits by a participant or beneficiary will be filed in writing with the administrator. Within a reasonable period after receipt of a claim, the administrator will provide written notice to any claimant whose claim has been wholly or partly denied, including: (a) the reasons for the denial, (b) the plan provisions on which the denial is based, (c) any additional material or information necessary to perfect the claim and the reasons it is necessary, and (d) the plan's claims review procedure. A claimant will be given a full and fair review by the administrator of the denial of his claim if he requests a review in writing within 60 days after notification of the denial. The claimant may review pertinent documents and may submit issues and comments orally, in writing, or both. The administrator

> will render its decision on review promptly and in writing and will include specific reasons for the decision and references to the plan provision on which the decision is based.

See Exh. F, at ¶6.3.

### Dr. Scapicchio's Employment Agreement with Mount Auburn Professional Services

19. On or about August 10, 1990, Dr. Scapicchio and MAPS entered into the aforementioned written employment agreement, under the terms of which Dr. Scapicchio agreed to furnish professional services to MAPS in exchange for compensation and other benefits as set forth in the employment agreement. See Exh. A, at ¶7; Exh. D.

20. The employment agreement, by its written terms, automatically renewed on an annual basis. See Exh. D, at ¶7.

21. The employment agreement included an Exhibit B, which was entitled "Benefits for Physicians at Mount Auburn Hospital", that stated employee physicians such as Dr. Scapicchio were entitled to take advantage of both long term disability insurance fully paid for by MAH and the retirement program known as RetirementPlus, which was defined in Exhibit B as "Mount Auburn Hospital's new defined contribution retirement savings plan." See Exh. D.

22. Exhibit B to the employment agreement further noted, in its description of RetirementPlus, that "[a]fter 2 years of service at a minimum of 20 hours per week, employees receive a contribution from the hospital to a 403b tax-deferred annuity account in their name." See Exh. D.

6

**The Long Term Disability Plan**

23.  In 1994, MAH began offering a new long term disability plan ("the LTD Plan") for its employees, including Dr. Scapicchio.  See Exh. A, at ¶11.

24.  Susan Glover, MAH's Director of Compensation and Benefits, distributed a memorandum to all MAH employees, dated August 18, 1994, that briefly summarized the LTD Plan and noted "Detailed booklets describing all of the life and long term disability insurance plans will be provided to plan participants this fall."  See Memorandum of Susan Glover, dated August 18, 1994, attached hereto as Exhibit H.

25.  The open enrollment period for the LTD Plan was August 22, 1994 through September 21, 1994, with coverage effective October 1, 1994.  See Exh. H.

26.  Dr. Scapicchio requested a written copy of the LTD Plan and/or the aforementioned detailed plan booklet on at least three occasions, but he never received any such written copy or detailed booklet.  See Exh. A, at ¶12.

27.  Dr. Scapicchio was informed by Nancy Stryker, a MAH administrator employed in the hospital's employee benefits office, that no written copy of the LTD Plan, or written summary or booklet of the same, would be provided to Dr. Scapicchio or any other MAH employee before the open enrollment period expired on September 21, 1994.  See Exh. A, at ¶13.

28.  Although Dr. Scapicchio was not allowed an opportunity to see either a written copy of the LTD Plan or the detailed booklet regarding the same beforehand, he enrolled in the LTD Plan prior to the enrollment deadline of September 21, 1994.

7

See Exh. A, at ¶14.  See, also, Dr. Scapicchio's Supplemental Life and Long Term Disability Insurance Enrollment Form, attached hereto as Exhibit I.

29. Dr. Scapicchio also purchased supplemental coverage under the LTD Plan, at his own expense.  See Exh. A, at ¶15.  See, also, Exh. I.

### Dr. Scapicchio's Disability

30. Dr. Scapicchio took an emergency 20-week medical leave of absence from his duties at MAH in 1995, due to progressive major depression; his last date of work at MAH was January 12, 1995.  See Exh. A, at ¶16.  See, also, Dr. Scapicchio's Application for Long Term Disability, attached hereto as Exhibit J.

31. As a result of his lack of improvement while on his emergency medical leave of absence, and upon the recommendation of MAH employees, Dr. Scapicchio applied for long term disability status pursuant to the LTD Plan on April 20, 1995, when he was 58 years of age.  See Exh. A, at ¶17.

32. Since Dr. Scapicchio's repeated requests for a copy of the LTD Plan and/or a copy of the detailed booklet referenced in Susan Glover's August 18, 1994 memorandum were never satisfied, Dr. Scapicchio sought and needed information and guidance from MAH's employment benefits office while he was contemplating whether he should apply for long-term disability benefits under the LTD Plan.  See Exh. A, at ¶19.

33. One of the MAH employees who worked in the MAH benefits office, Nancy Stryker, initially informed Dr. Scapicchio that he would receive long term disability payments until death.  See Exh. A, at ¶20.

34. Dr. Scapicchio realized that it was unlikely his disability benefits would last until his death, so he asked Ms. Stryker to confirm this issue with a representative from Liberty Mutual Insurance Company, which funded the LTD Disability Plan on behalf of MAH.  See Exh. A, at ¶21.

35. Ms. Stryker subsequently telephoned the Liberty Mutual representative while Dr. Scapicchio remained in her office.  See Exh. A, at ¶22.

36. As a result of the telephone discussion between Nancy Stryker and the Liberty Mutual representative, Dr. Scapicchio learned that his disability benefits would only continue until he reached the age of 65 years.  See Exh. A, at ¶23.

37. Ms. Stryker subsequently encouraged Dr. Scapicchio to apply for benefits under the LTD Plan, and she told Dr. Scapicchio that MAH would continue to make employer contributions to his retirement account until he reached the age of 65 years.  See Exh. A, at ¶24.

38. In his application for long term disability benefits, Dr. Scapicchio acknowledged that, due to his condition of progressive major depression, he was no longer able to fulfill his professional duties as a physician.  See Exh. A, at ¶25.  See, also, Exh. J.

39. By letter dated July 10, 1995, Dr. Scapicchio received written notification that his application for long-term disability payments had been approved.  See Exh. A, at ¶26.  See, also, July 10, 1995 letter from Barbara DiCarlo to Dr. Scapicchio, attached hereto as Exhibit K.

40. Dr. Scapicchio's last date of work at MAH was January 12, 1995.  See Exh. A, at ¶16.  See, also, December 12, 1995 letter from Dr. Scapicchio to Nancy Stryker,

        attached hereto as Exhibit L, and January 11, 1996 letter from Nancy Stryker to Liberty Mutual, attached hereto as Exhibit M.

41. Under the supplemental terms of the LTD Plan as purchased by Dr. Scapicchio, he was entitled to commence disability payments on April 13, 1995, which was ninety (90) days after his first date of disability. See Exh. A, at ¶27.

42. Dr. Scapicchio's payments under the LTD Plan had an effective commencement date of April 13, 1995. See Exh. A, at ¶28.

43. Dr. Scapicchio continued to request a copy of the LTD Plan. See Exh. A, at ¶29.

44. By letter dated August 9, 1995, Dr. Scapicchio was provided with a copy of the long-term disability contract between MAH and Liberty Mutual and notified, for the first time, that the LTD Plan included a two-year limitation for disability caused by mental illness; stated differently, the LTD Plan only covers disability caused by mental illness, such as depression, for two years following the allowance of disability benefits. See Exh. A, at ¶30. See, also, August 9, 1995 letter from Tiffany Curtis to Dr. Scapicchio, attached hereto as Exhibit N. See, also, Long Term Disability Policy, attached hereto as Exhibit O, at Section 4 (Provision entitled "Mental Illness Limitation").

45. As a result of the two year limitation in the LTD Plan for disability caused by mental illness, Dr. Scapicchio's payments under the LTD Plan were discontinued on April 13, 1997. See Exh. A, at ¶31. See, also, November 21, 1997 letter from Susan Colinet to Nancy Stryker, attached hereto as Exhibit P.

46. Dr. Scapicchio's long term disability benefits were restored in January 1998, when he was diagnosed as being disabled due to obstructive sleep apnea and

       daytime somnolence.  See Exh. A, at ¶32.  See, also, January 21, 1998 letter from Susan Colinet to Nancy Stryker, attached hereto as Exhibit Q.  See, also, Proof of Total disability, attached hereto as Exh. R.

47. After Dr. Scapicchio's long term disability coverage was restored in January 1998, Dr. Scapicchio remained on long-term disability under the LTD Plan until December 2002, when he reached the age of 65 years.  See Exh. A, at ¶33.

**The Defendants' Failure to Properly Fund Dr. Scapicchio's Retirement Account**

48. On December 18, 2002, Dr. Scapicchio's status as a disabled employee ceased, because he reached the age of 65 years on that date.  See Exh. A, at ¶34.

49. MAH continued to pay Dr. Scapicchio and issue W-2 forms to him from the time he went on long term disability status in 1995 until the time he reached the age of 65 years in December 2002.  See Exh. A, at ¶35.  See, also, W-2 Forms for Years 1995 through 2002, attached hereto as Exhibit S.

50. Although Dr. Scapicchio's disability benefits under the LTD Plan commenced in April 1995, MAH continued to fund his retirement account through employer contributions, in accordance with the Retirement Plan, through July 1995.  See Exh. A, at ¶36.  See, also, Fidelity Investments Retirement Account Statements for the periods April 1, 1995–June 30, 1995 and July 1, 1995 – September 30, 1995, attached hereto as Exhibit T.

51. On August 2, 2002, Dr. Scapicchio learned, for the first time, that MAH stopped making contributions to his account under the Retirement Plan in July 1995.  See Exh. A, at ¶37.

52. On August 12, 2002, approximately four (4) months before Dr. Scapicchio reached the age of 65 years, he sent a claim to Jeanette Clough, the president of MAH, in which he requested an explanation as to why MAH ceased making contributions to his retirement account in July 1995. See August 12, 2002 letter from Dr. Scapicchio to Jeanette Clough, attached hereto as Exhibit U.

53. On October 15, 2002, more than 60 days after Dr. Scapicchio submitted his aforementioned August 12, 2002 claim for employer retirement contributions, Defendant Thomas Fabiano sent a letter to Dr. Scapicchio that denied any liability for the contested employer retirement contributions. See October 15, 2002 letter from Thomas Fabiano to Dr. Scapicchio, attached hereto as Exhibit V.

54. In his October 15, 2002 denial, Mr. Fabiano alleged that Dr. Scapicchio ceased being paid or compensated by MAH upon the inception of long term disability benefits and, therefore, MAH no longer was responsible for making any employer contributions to Dr. Scapicchio's retirement account. See Exh. V.

55. Under cover of letter dated January 31, 2003, Thomas Fabiano provided Dr. Scapicchio – for the first time – with the summary plan description for the LTD Plan that had been promised in Susan Glover's August 18, 1994 memorandum; the summary plan description indicated a publication date of June 15, 1995, approximately 6 months after Dr. Scapicchio began his emergency medical leave of absence and approximately 3 months after Dr. Scapicchio applied for benefits

under the LTD Plan.  See Exh. A, at ¶38.

          Respectfully submitted,
          **ANTHONY P. SCAPICCHIO, M.D.**
          By his attorney,

          /s/ John S. Day
          _____
          John S. Day (BBO #639249)
          167 Washington Street
          Norwell, MA 02061
          781-878-6541 (telephone)
          781-846-0780 (facsimile)
          jday@attorneyday.com (electronic mail)

Date:   January 21, 2005

**CERTIFICATE OF SERVICE**

I, John S. Day, hereby certify that on the 21st day of January, 2005, I caused a copy of the foregoing to be served, by electronic filing, upon Philip M. Cronin, Peabody & Arnold, 30 Rowes Wharf, 6th Floor, Boston, Massachusetts 02110.

          /s/ John S. Day
          _____
          John S. Day