FILED
IN CLERKS OFFICE

2005 FEB -4  A 10: 46

U.S. DISTRICT COURT
DISTRICT OF MASS.

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

ANTHONY P. SCAPICCHIO
       Plaintiff

v.

MOUNT AUBURN PROFESSIONAL SERVICES, MOUNT AUBURN HOSPITAL, as administrator of the Mount Auburn Hospital RetirementPlus 403(b) Plan, and THOMAS FABIANO
       Defendants

CIVIL ACTION NO. 04-11573-RWZ

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF REASONS WHY THE MOTION SHOULD NOT BE GRANTED

Defendants (collectively "Mount Auburn Hospital") submit this opposition and memorandum of reasons pursuant to L.R. 7.1(B) (2) to Plaintiff Anthony P. Scapicchio's (hereinafter "Scapicchio") Motion for Summary Judgment in this ERISA action for alleged benefits under 29 U.S.C. § 1132(a) (1) (B).

In his motion, Scapicchio avoids the plain language of the RetirementPlus 403(b) Plan ("the Plan") which clearly establishes that he is not entitled to defined contributions from Mount Auburn Hospital based on long term disability payments.

### Defendants' Memorandum of Reasons

**I.    Scapicchio's Entitlement to Benefits is Governed by the Terms of the 1990 RetirementPlus Plan**

Scapicchio in his memorandum of law avoids the language of the RetirementPlus Plan. The Plan's plain language controls this Court's review of Mount Auburn Hospital's determination that Scapicchio was not entitled to defined contributions based on long term

disability benefits and not income for performance of services. The First Circuit teaches that "ensur[ing] the integrity of written . . . benefit plans" is a "primary function[]" of ERISA; consequently, this Court must enforce "the plain language" of the Plan "in accordance with 'its literal and natural meaning." Harris v. Harvard Pilgrim Health Care, Inc., 208 F.3d 274, 277-278 (1st Cir. 2000). Mount Auburn Hospital's Memorandum supporting its Motion for Summary Judgment sets forth fully its argument that Scapicchio is not owed the benefits he seeks under the language of the Plan. (Def. Mem. at 6-9)

Rather than showing how the Plan would accord benefits, Scapicchio introduces irrelevant issues. Scapicchio notes that under the pension plan in effect at Mount Auburn Hospital in 1976, a disabled employee would "continue to be included in the Plan and to earn Retirement Credits." (Pl. Mem at 2-3.) However, "Retirement Credits" under the 1976 plan are not equivalent to defined contributions under the RetirementPlus Plan. In fact, the 1976 plan bears no relation generally to the RetirementPlus 403(b) Plan. The 1976 plan was a defined benefit plan that was terminated on December 31, 1989. See Affidavit of the Defendants in Support of Their Motion for Summary Judgment ("Def. Aff.") at ¶ 21. The RetirementPlus 403(b) Plan is a defined contribution plan which became effective on January 1, 1990, replacing the 1976 plan. Thus, the 1976 plan has no effect on Scapicchio's present claim for benefits under the RetirementPlus Plan.

Not only are "Retirement Credits" totally different from defined contributions based on pay, but Scapicchio could not have qualified for retirement credits under the old plan because he was not entitled to receive Social Security Disability Benefits in 1989 or prior thereto. (Pl. Ex. E. at 13)

Similarly, Scapicchio recites facts related to the Mount Auburn Hospital Long Term Disability plan ("the LTD plan") that are irrelevant. Scapicchio claims that he was not provided

2

a copy of the LTD plan document or plan summary. (Pl. Aff. ¶14.) He also notes that he ceased receiving benefits on April 13, 1997 pursuant to a two-year limitation for disability caused by mental illness. (Pl. Aff. ¶31.) His benefits were restored in January 1998, and he was back paid for the uncovered portion of 1997. See Supplemental Affidavit of Defendants in Support of Their Opposition to Plaintiff's Motion for Summary Judgment ("Def. Supp. Aff.") at ¶¶ 14-17.

The LTD plan was a separate plan from the RetirementPlus Plan. Liberty was the fiduciary of the LTD plan; none of the defendants in the present case were fiduciaries of the LTD plan at any time. (Def. Supp. Aff. ¶ 15.) Thus, the facts and circumstances surrounding Scapicchio's receipt of benefits under the LTD plan are not relevant to his eligibility for benefits under the RetirementPlus Plan.

Scapicchio misstates the terms of his August 10, 1990 letter agreement for his employment at Mount Auburn Hospital. He contends that he was "entitled to take advantage of both long-term disability insurance fully paid for by MAH and the retirement program." (Pl. Statement of Undisputed Facts, ¶21.) If Scapicchio is saying that the employment agreement provided for defined contributions based on disability benefits, he is wrong. There is nothing in the letter that even hints that. (Pl. Ex. D ¶5.)

Mount Auburn Hospital said that its Board of Trustees "shall, from time to time, adopt a fringe benefit plan." (Pl. Ex. D ¶5.) Any such plan may be modified. The letter had an attachment outlining current fringe benefits. These were health insurance, flexcare, life and accidental death and dismemberment insurance, long-term disability insurance, RetirementPlus, credit union, paid time off and parking. There is nothing in the attachment to the letter agreement (Pl. Ex. D, Ex. B) that is inconsistent with the Plan. In fact, the paragraph describing RetirementPlus states that the defined contribution "is equal to a percentage of the employee's gross monthly salary."

3

The Plan is not to be interpreted by extrinsic documents. The Plan is governed by the "literal and natural meaning" of its language. Harris v. Harvard Pilgrim Health Care, Inc., 208 F.3d 274, 277-278 (1st Cir., 2000).

### II. The Documentary and Regulatory Evidence Shows That Scapicchio is Only Entitled to RetirementPlus Plan Contributions Based on Compensation Received From Mount Auburn Hospital

Scapicchio claims that he is entitled to contributions to his RetirementPlus plan based on (1) the fact that Mount Auburn Hospital made contributions to his RetirementPlus Plan from January-June 1995, after he became disabled, (2) the fact that Mount Auburn Hospital issued W-2 statements reflecting his LTD plan benefits, and (3) a Department of Labor regulation.

Mount Auburn's payment of benefits from January-June 1995 is fully consistent with the RetirementPlus Plan document. The Plan provides that contributions from the hospital consist of "a percentage of your pay," with "pay" defined as "compensation received by you from the hospital . . . for the performance of services." (Def. Aff. Ex. 1 ¶2.3.) From January until June 1995, Scapicchio was on a 20-week medical leave of absence, for which he received compensation from Mount Auburn Hospital. (Def. Supp. Aff. ¶11.) In accordance with terms of the Plan, Mount Auburn Hospital made defined contributions based on this compensation. (Def. Supp. Aff. ¶12.) After his medical leave of absence ended on or about June 30, 1995, Scapicchio received only LTD Plan benefits; he received no further compensation from Mount Auburn Hospital. (Def. Supp. Aff. ¶13.) Consequently, in accordance with the terms of the RetirementPlus Plan, Mount Auburn Hospital ceased making contributions when Scapicchio no longer received "compensation . . . from the hospital."

Scapicchio's LTD Plan benefits began on April 13, 1995, while he was still on medical leave of absence. (Def. Supp. Aff. ¶14.) For the period 1995-2002, Mount Auburn issued W-2 forms based upon data provided by Liberty reflecting the amount of LTD Plan benefits he

4

received from Liberty. (Def. Supp. Aff. ¶¶18-31.) A portion of each year's LTD benefit was taxable and appears in box 1 on the W-2, and the portion not taxable appears in box 12. Apart from his medical leave of absence compensation received in 1995, none of the 1995-2002 W-2 forms reflects compensation received from Mount Auburn Hospital for services provided during those years. In fact, Scapicchio received no compensation from Mount Auburn Hospital after June 30, 1995, (Def. Supp. Aff. ¶13), and he resigned effective February 8, 1996. (Def. Aff. ¶15.)

Scapicchio suggests a Department of Labor regulation in an attempt to prove that he received compensation from Mount Auburn Hospital. 29 C.F.R. 2530.200b-2 defines an "hour of service" as that term is used in §§ 202, 203, and 204 of ERISA. 2530.200b-2(a). For those purposes only, an "hour of service" includes hours "during which no duties are performed . . . due to . . . incapacity (including disability) . . ." 2530.200b-2(a)(2). In fact the language quoted by Scapicchio is preceded by the limiting clause "[f]or purposes of this paragraph (a)(2)."

Hours of service as defined in the regulations has no bearing on Scapicchio's eligibility for contributions to his RetirementPlus Plan. The RetirmentPlus Plan does not depend on hours of service in calculating defined contributions. Instead, contributions are based on pay, defined specifically as "compensation received by you from the hospital . . . for the performance of services." (Def. Aff. Ex. 1 ¶2.3) The Plan further clarifies that pay does not include any amounts "not constituting direct compensation for services." Id. The terms of the Labor regulations cited by Scapicchio do not assist in interpreting the language of the Plan.

### III. Scapicchio Cannot Show Discrimination Under ERISA § 510 Because He Cannot Show Intentional Discrimination

Scapicchio argues in conclusive fashion that Mount Auburn Hospital violates ERISA's antidiscrimination provision, 29 U.S.C. § 1140, by failing to make employer contributions to his RetirementPlus Plan based upon his long term disability benefits. In pertinent part, section 1140

5

makes it "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." The First Circuit has defined the "ultimate inquiry" as "whether the employment action was taken with the specific intent of interfering with the employee's ERISA benefits." Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995).[1]

In Barbour, the adverse employment action was a termination of employment. Id. Barbour makes clear that § 1140 protects employees who are discharged or adversely treated for exercising ERISA rights. To this end, the Barbour court applies the McDonnell-Douglas burden-shifting analysis to § 1140 claims. Id. at 37-38. In the present case, however, Scapicchio suffered no adverse employment action but instead, resigned from the medical staff, in accordance with Mount Auburn Hospital bylaws, on February 8, 1996. (Def. Aff. ¶¶14-15) Scapicchio was provided, at all times, with employer contributions to his RetirementPlus Plan under the terms of that Plan.

Further, Scapicchio does not even attempt to make a prima facie case that he was intentionally discriminated against for exercising his rights under RetirementPlus, as Barbour requires. See 63 F.3d at 38. Indeed, Scapicchio has no evidence to make such a case. Scapicchio's collection of benefits from his LTD Plan made him ineligible for employer

---

[1] Scapicchio cites Vartanian v. Monsanto Co., 880 F.Supp. 63, 71 (D.Mass. 1995) for the proposition that § 1140 reaches a "broad range of employer conduct including . . . discriminatory modification of a" plan. This language is inapplicable to the present case. Scapicchio does not allege any modification of the RetirementPlus Plan. Further, this view of § 1140 was not embraced by the First Circuit in its considerations of Vartanian on appeal. Vartanian v. Monsanto Co., 14 F.3d 703 (1st Cir. 1994); Vartanian v. Monsanto Co., 131 F.3d 264 (1st Cir. 1997).

6

contributions to the RetirementPlus Plan—a result compelled by the language of the RetirementPlus Plan. Scapicchio does not even suggest that Mount Auburn Hospital's action was motivated by impermissible intentional discrimination.

### IV. Scapicchio Cannot Assert an Americans With Disabilities Act Violation in the Context of an ERISA Claim

Scapicchio further claims that Mount Auburn violated Title I of the Americans With Disabilities Act, 42 U.S.C. §12101ff ("the ADA"). However, Scapicchio's complaint does not state a cause of action under the ADA, nor does he cite any law for the proposition that an Americans With Disabilities Act violation can be asserted by an ERISA claim. In order to show a violation of the ADA, Scapicchio would have to show: "1) that he was disabled within the meaning of the ADA; 2) that he was qualified to perform the essential functions of the job, either with or without a reasonable accommodation; and 3) that the employer took adverse action against him because of the disability." Bailey v. Georgia Pacific Corp., 306 F.3d 1162, 1166 (1st Cir. 2002).

Scapicchio offers no evidence to show that he was disabled within the meaning of the ADA. To be disabled within the meaning of the statute, Scapicchio would have to show that he has an impairment which substantially limits one or more major life activities. 306 F.3d at 1167. Stepping aside the issue whether depression is an impairment of a major life activity, Scapicchio never requested that Mount Auburn Hospital allow him to perform his medical duties with a reasonable accommodation. To the contrary, Scapicchio asserted he was totally disabled from performing his medical profession. The ADA is not implicated in this case.

Further, the relief Scapicchio seeks is unprecedented. Scapicchio claims that he was entitled to retirement contributions based on long term disability benefits and that the ADA requires such contributions. In seeking this relief, he attempts to use the ADA to expand the scope of defined contributions by contending that even though an ERISA plan is clear, he would

7

be entitled to defined contributions under ADA because he is disabled. Even if it were applicable, the ADA does not trump ERISA.

### V. Scapicchio's Response to a Conversation with Nancy Stryker is Improper and Should be Stricken

Mount Auburn Hospital has moved to strike Scapicchio's references in his affidavit of conversations with Nancy Stryker whom he identified as a "MAH administrator employed in the hospital's employee benefits office." (Pl. Aff. ¶¶13, 20, 21, 22, 23, 24.)

Mount Auburn Hospital has filed with the opposition to Scapicchio's motion for summary judgment an affidavit of Nancy Stryker denying that she made the statements attributed to her by Scapicchio and affirming that she did not have authority to bind the plan. (Stryker Aff. ¶¶7, 8.) This disputed fact, however, does not preclude the grant of summary judgment for Mount Auburn Hospital.

Nancy Stryker was not authorized to act for or on behalf of the Plan. (Def. Supp. Aff. ¶5, 6, 7, 8, 9, 10.) (Stryker Aff. ¶3.) She was not the plan fiduciary. (Def. Supp. Aff. ¶6.) (Stryer Aff. ¶5.) Scapicchio's account of his conversation with Stryker amount to an amendment or modification of the Plan. She had no authority to do that. (Def. Supp. Aff. ¶8.) (Stryker Aff. ¶7.)

Article VI, section 6.1 of the Plan provides that Mount Auburn Hospital will appoint an administrator to run the plan. (Def. Aff. Ex. 1.) The administrator was Thomas Fabiano. (Def. Supp. Aff. ¶7.) Only the administrator – Thomas Fabiano – has the authority under section 6.2 "to interpret and apply any plan provision." (Def. Aff. Ex. 1.)

The Plan provides that Mount Auburn Hospital and Fabiano as plan administrators are the named fiduciaries. (Def. Aff. Ex. 1, Art. VI, sec. 6.4.) Stryker was not a fiduciary. (Supp. Aff. ¶6.) (Stryker Aff. ¶5.)

8

Only Mount Auburn Hospital could amend the plan. (Def. Aff., Ex. 1, Art. VII, sec. 7.1.) Thus, not even Fabiano as one of the Plan fiduciaries could amend the Plan.

Scapicchio in his affidavit does not even attempt to prove Stryker's authority to interpret the Plan in a manner entirely inconsistent with the plain language of the Plan.

## VI.    There is no Estoppel

Because Stryker did not have authority to bind the Plan to accord benefits to Scapicchio that were not available to all plan participants who were receiving disability benefits, there is no need to consider Scapicchio's estoppel argument.

Even is estoppel were relevant, the First Circuit has yet to decide whether a cause of action for estoppel lies under ERISA. In its most recent treatment of this question, the Circuit expressly reserved the question "whether there may exist an equitable estoppel claim in cases where misrepresentations exist apart from the plan summary." Mauser v. Raytheon Co. Pension Plan for Salaried Employees, 239 F.3d 51, 58 (1st Cir. 2001). Prior cases had assumed without deciding that an estoppel claim could be stated under ERISA. City of Hope National Medical Center v. Health Plus, Inc., 156 F.3d 223, 230 n. 9 (1st Cir. 1998); Law v. Ernst & Young, 956 F.2d 364, 370 n.9 (1st Cir. 1992). Consequently, several Massachusetts district courts have considered but found no estoppel under ERISA. Kodes v. Warren Corp., 24 F.Supp.2d 93, 100 (D. Mass. 1998); Jorstad v. Connecticut General Life Insurance Co., 844 F.Supp. 46, 48 (D. Mass. 1994) (collecting cases standing for the proposition that a promissory estoppel claim is pre-empted under ERISA); Spaulding v. Reliance Standard Life Insurance Co., 835 F.Supp. 23, 30 (D. Mass. 1993).

Common law estoppel theory requires (1) a misrepresentation of fact made to the plaintiff; (2) a rightful reliance thereon; and (3) injury or damage to plaintiff resulting from a denial of benefits by the party making the representation. Cleary v. Graphic Communications

9

International Union Supplemental Retirement and Disability Fund, 841 F.2d 444, 447 (1st Cir. 1988).

Even assuming the conversation with Stryker took place, Scapicchio cannot satisfy these elements as a matter of law. In Cleary, the court held that no representation had been made because the person making the representation did not have "authority or apparent authority to bind" the plan. 841 F.2d at 447. The Court then held that "informal" comments by a plan administrator were not sufficient to bind the plan. 841 F.2d at 448.

Scapicchio's affidavit does not show a misrepresentation of fact. Scapicchio says that he applied for long term disability benefits on April 20, 1995. (Pl. Aff. ¶17.) From the sequence of events recounted in paragraphs 20, 21, 22, and 23 of his affidavit, it is apparent that the alleged conversation occurred after April 20, 1995 and from Scapicchio's account was a statement of opinion.

There could be no rightful reliance on her opinion to Scapicchio's damage. By his own admission, he was unable to work since January 12, 1995. (Pl. Aff. ¶16.) He did not rely to his detriment on Stryker's alleged statement because his only recourse for disability benefits was the Liberty policy. If he did nothing, he would have had no income and would not be entitled to defined contributions.

Further, Stryker's alleged representation would be a plan modification. Her alleged representation is contrary to the plain language of the plan, which states that contributions will only be based on "compensation received by you from the hospital . . . for the performance of services." ( Def. Aff. Ex. 1 ¶2.3.) As Kane v. Aetna Life Ins., 893 F.2d 1283 (11th Cir. 1989), recognizes, an estoppel cannot modify a plan. See also, Law v. Ernst & Young, 956 F.2d 364 at 370 n. 9 (stating that an oral modification would violate 29 U.S.C. § 1102 that an ERISA plan be maintained in writing).

10

There is another reason that those portions of Scapicchio's affidavit referring to conversations with Stryker are improper and must be stricken.

The "ordinary rule" is that the District Court reviews "the record made before the entity being reviewed." Liston v. Unum Corp. Officer Severance Plan, 330 F.3d 19, 23 (1st Cir., 2003). In this appeal of a benefits decision by the plan fiduciary, Scapicchio never presented to the fiduciary his new story of a conversation with Stryker. It is not part of the administrative record and should be stricken.

Scapicchio in his letter of August 12, 2002 to the President of Mount Auburn Hospital says nothing about any conversations with Stryker. To the contrary, he wrote "In January 1995, at age 58, I became disabled and was encouraged to apply for LTD benefits and was assured by MAH that my disability was covered to age 65." (Def. Aff. Ex. 14.) Tellingly, he did not add that Stryker told him that he would also receive contributions based on disability payments.

Scapicchio's attorney by letter dated October 24, 2002 wrote that "Dr. Scapicchio states that he was informed by your organization, when he first became a participant in the retirement plan, that contributions by the employer would continue during any period of disability." (Def. Aff. Ex. 16.) His attorney reiterated that contention in his December 23, 2002 letter that "Dr. Scapicchio says that Mount Auburn Hospital represented to him, when he first became a participant, that contributions would continue to be made during any period of disability." (Def. Aff. Ex. 18.)

The key clause in the December 23, 2002 letter is "when he first became a participant." Scapicchio "first became a participant" after his hiring in 1974. (Def. Aff. Ex. 8.) He became a participant in a defined benefit plan that provided for disability retirement benefits for employees who become disabled after age 45, completed ten years of vesting service and are eligible to receive social security disability payments. (Pl. Aff. Ex. E.) That plan terminated on December

11

31, 1989 and was replaced by the defined contributions plan that does not provide disability retirement benefits. Thus, neither Scapicchio nor his attorney referenced a conversation with Stryker in 1995. Stryker denies the conversation ever took place. (Stryker Aff. ¶8.)

The Plan Fiduciary on January 21, 2003 wrote Scapicchio's attorney and asked him to provide relevant details about the statement including the identity of the person who made the statement, the date and place and the statement made. (Def. Aff. Ex. 19.) There was no response.

### VII. The W-2 Forms Support Mount Auburn Hospital's Position that the Statute of Limitations Bars the Claim

Scapicchio has submitted with his affidavit a series of Internal Revenue Service W-2 forms starting in 1995 until 2002. (Pl. Aff. Ex. S.)

The supplemental affidavit of Thomas Fabiano explains that the 1995 W-2 is for income received before Scapicchio's disability and his medical leave of absence and a second W-2 records "sick pay" or the amount of disability benefits received from Liberty. (Def. Supp. Aff. ¶¶19, 20.) Thus, the W-2 forms for 1995 are further evidence that Scapicchio knew in 1995 and in any event before April 15, 1996 that Mount Auburn Hospital was not making defined contributions based on disability income.

### VIII. Scapicchio Has Not Proven a Loss of Benefits

Scapicchio does not address the question of remedy in his summary judgment motion. In a December 17, 2004 statement to the Court that he intended to pursue his claim even though the claim would appear de minimus, Scapicchio "assumes that his annual compensation, if he had not taken long-term disability benefits in 1995, would have continued to exceed the maximum annual employer contribution limit." In other words, Scapicchio calculates benefits as if he were still receiving compensation from Mount Auburn. There is simply no basis in the Plan for Mount Auburn to provide an employer contribution on income Scapicchio did not receive.

All of the remaining categories of money which Scapicchio suggested to the Court as grounds to proceed with the case are damages, which are impermissible under ERISA. The Supreme Court of the United States has held that "extracontractual damages" are unavailable in an ERISA benefits case under 29 U.S.C. §1132(a)(1)(B)—the only provision pled by Scapicchio. Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 124, 144 (1985). Further, the Supreme Court has held that "appropriate equitable relief" under §1132(a)(3) also does not include compensatory or punitive damages—in fact, appropriate equitable relief under this provision has been limited to that which was "typically available in equity (such as injunction, mandamus, and restitution, but not compensatory damages)." Mertens v. Hewitt Assocs., 508 U.S. 248, 256 (1993).

Scapicchio seeks market appreciation of the employer contributions he claims Mount Auburn Hospital should have made during the period of his disability. Market appreciation on benefits claimed in an employee profit sharing retirement plan has been held not to be "benefits required by the terms of the plan." Green v. AIM Executive, Inc., 897 F.Supp. 342, 347 (N.D. Ohio 1995). Instead, market appreciation on plan benefits has been held to be "damages" and therefore unavailable under Russell and Mertens.

The remaining funds Scapicchio claims are his employee contributions and the market appreciation on those contributions. These funds would be entirely extracontractual compensatory damages, impermissible under Russell and Mertens. Further, recovery of Scapicchio's employee contributions would be entirely duplicative—Scapicchio has the money he now claims he would have contributed to his RetirementPlus Plan and was free at all times to invest in a tax-deferred IRA which would provide similar returns to his RetirementPlus Plan account.

### Conclusion

For the foregoing reasons, Mount Auburn Professional Services, Mount Auburn Hospital and Thomas Fabiano respectfully request that the Court allow their motion for summary judgment.

                    MOUNT AUBURN PROFESSIONAL
                    SERVICES, MOUNT AUBURN HOSPITAL,
                    as the administrator of MOUNT AUBURN
                    HOSPITAL RETIREMENTPLUS 403(b) PLAN
                    and THOMAS FABIANO
                    By their Attorneys,

*/s/ Philip M. Cronin*
Philip M. Cronin, BBO #106060
Michael J. Cedrone, BBO #657708
PEABODY & ARNOLD LLP
30 Rowes Wharf, 6th Floor
Boston, MA 02110
(617) 951.2065

606852_1
5436-90871

14